IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JSW STEEL (USA) INC. and JSW STEEL USA OHIO, INC., <br><br> Plaintiffs, <br><br> v. <br><br><br> NUCOR CORP., UNITED STATES STEEL CORP., AK STEEL HOLDING CORP., and CLEVELAND-CLIFFS INC., <br><br> Defendants. | CIVIL ACTION NO.  21-CV-1842 <br><br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs JSW Steel (USA) Inc. ("JSW Baytown") and JSW Steel USA Ohio, Inc. ("JSW Mingo Junction") (collectively, "JSW") respectfully bring this action for treble damages under the antitrust laws of the United States and Texas law against Defendants Nucor Corporation ("Nucor"), United States Steel Corporation ("U.S. Steel"), AK Steel Holding Corporation ("AK Steel"), and Cleveland-Cliffs Inc. ("Cleveland-Cliffs") (collectively, "Defendants").

## NATURE OF THE CASE

1.     This case involves a conspiracy and group boycott by Defendants in violation of Section 1 of the Sherman Act and Texas state law to hamstring the ability of their competitor, JSW, to manufacture and sell competing steel pipe, plate, and coil products for a wide range of infrastructure and other end-uses, raise JSW's costs, and force it to postpone a major, state-of-the-art expansion of its plate and pipe mill, thereby causing injury to competition, U.S. steel purchasers, and JSW.

1

2.      JSW is a U.S. manufacturer of carbon and alloy steel plate, pipe, and coil that owns and operates manufacturing facilities in Baytown, Texas and Mingo Junction, Ohio.  JSW purchases semi-finished steel slab, rolls the slab into high-quality finished steel pipe, plate, and coil products and sells them for use in critical infrastructure projects, such as natural gas and oil transmission pipelines, shipbuilding, transmission pole towers, wind towers, railroad tank cars, and other heavy equipment industries in the United States that need high quality carbon and alloy steel plate, pipe, and coil products.

3.      Semi-finished steel slab is the primary feedstock for all of the products JSW manufactures: without it, JSW cannot make its steel pipe and plate products.  Historically, JSW was able to purchase semi-finished steel slab from producers outside the United States, but due to quotas and other limitations on quantity, and to significant tariffs imposed beginning in 2018, imports were not available in the quantity JSW required.

4.      From approximately 2018 to the present, Defendants—the largest domestic steel producers and makers of semi-finished steel slab who together hold more than 80% of domestic steelmaking capacity—conspired to refuse to supply JSW with domestic slab.

5.      Defendants' actions make it abundantly clear that they conspired to cause direct harm to JSW.  Beginning in at least March 2018, key executives for Defendants, including their CEOs, met repeatedly and acknowledged that they were communicating directly with one another; representatives of Nucor—the ringleader of this illegal boycott and the company that stood to benefit the most from harming JSW—even admitted in Fall 2018 that at least it and U.S. Steel were "***working together***."  Defendants continued to meet throughout 2018 and 2019, and, on information and belief, continued to communicate until the present in furtherance of their boycott of JSW.

6.     Defendants' illegal agreements resulted in near-simultaneous and parallel statements (made under penalty of criminal prosecution) by each of them, beginning in May 2018, that U.S. Steel and AK Steel were both capable of making domestic slabs in sufficient quantities and quality to meet JSW's needs within a matter of weeks, and that both were willing to sell to JSW on commercially reasonable terms.  Defendants' conspiracy included certified statements by Nucor abouts its rivals' businesses—that U.S. Steel and AK Steel could make semi-finished steel slabs sufficient to meet JSW's chemical, metallurgical, and volume requirements *and* that they were willing to sell it to JSW—which it could not have known and made absent coordinating with U.S. Steel and AK Steel.

7.     Despite these statements, however, Defendants' agreements resulted in their near-simultaneous failure to sell any semi-finished steel slabs to JSW.

8.     Defendants admitted that it was in their self-interest to sell semi-finished steel slab to JSW.  AK Steel and U.S. Steel both represented in certified statements—within *two days* of one another in May 2018—that they could ***each*** supply ***100%*** of JSW's slab needs and could do so within eight weeks of receiving an order from JSW.  It was in both AK Steel's and U.S. Steel's economic self-interest to sell slab to JSW, a significant slab consumer that would have made large monthly orders.  Indeed, U.S. Steel even admitted that it had "***enormous incentive***" to sell to JSW.

9.     Moreover, although AK Steel and U.S. Steel purportedly keep their manufacturing processes confidential and non-public, and their statements about their ability to make slabs to JSW's chemical, metallurgical, and volume requirements were submitted confidentially, Defendant Nucor made the remarkable representation—on the *same day* that U.S. Steel made its non-public representations, and just *two days* after AK Steel's non-public statements—that AK Steel and U.S. Steel could not only make product to JSW's specifications, but that they were

3

"*ready and willing to supply JSW*" with JSW's critical slab feedstock "*at commercially reasonable prices*."   On information and belief, Nucor would have no reason—absent prior coordination—to steer business to its rivals, let alone tout AK Steel's and U.S. Steel's ability and willingness to supply JSW.

10.     U.S. Steel and AK Steel made their near-simultaneous admissions about their ability and willingness to timely sell JSW its needed supply of slab feedstock—and Nucor affirmed those representations—at a critical time for JSW, as they occurred shortly after a public announcement of JSW's plans to implement a massive, $500 million expansion of its manufacturing facility in Baytown, Texas.   That expansion project was aimed at building a "Plate Mill of the Future," making JSW Baytown the only melt and manufacture plate mill in North America with a contiguous pipe mill.   The plan included building the most technologically advanced and eco-friendly electric arc furnace ("EAF") and slab caster in the United States, thereby setting a new industry standard.   JSW anticipated the project would provide it with the capability to manufacture its own 8, 10, and 12-inch steel slab at the most environmentally and technologically advanced standards available anywhere in the country; the project would also allow JSW to manufacture a much greater volume of finished steel products at much lower costs per ton and, thus, sell its plate and pipe products at much lower prices to its customers.   The Baytown project was expected to create hundreds of jobs in, and contribute at least $3.4 billion in economic development, to South Texas.   On information and belief, each of the Defendants was aware of JSW's publicly announced expansion of Baytown.

11.     The Baytown expansion project was just one part of JSW's broader expansion in North America.   In 2018, JSW purchased a steel mill in Mingo Junction, Ohio and announced plans for a two-phase ramp-up: in the first phase, JSW intended to revamp and restart the EAF and

the slab caster at the Mingo Junction location and modernize the hot strip mill.  In the second phase, JSW planned to add another EAF and manufacturing equipment at the hot strip mill to make the Ohio facility a fully integrated unit.  The upgrades to this facility were directly aimed at increasing Mingo Junction's capacity and improving its capability to make hot-rolled coil bands in direct competition with the three Defendants.

12.     The Mingo Junction and Baytown projects together placed JSW in a stronger position than ever to compete directly with the Defendants.  On information and belief, Defendants were aware of JSW's publicly announced plans, as well as the threat these plans posed to Defendants' own market positions.

13.     However, despite U.S. Steel and AK Steel making near-simultaneous admissions about their ability and willingness to timely sell JSW its needed supply of slab feedstock at commercially reasonable prices—and Nucor's affirmation of those representations—when JSW subsequently approached AK Steel and U.S. Steel in 2019, neither company supplied JSW the slab it had previously certified it had the "enormous incentive" to fully and quickly supply.  Such conduct against their admitted self-interest is explained only by Defendants' illicit agreement to boycott JSW.

14.     Defendants' boycott has continued to the present, and additional statements were made in 2021 in furtherance of the boycott.  Indeed, Defendants U.S. Steel and Cleveland-Cliffs (the new owner of AK Steel) again represented in 2021 that they were willing and able to supply JSW with domestically manufactured steel slab.  However, to this day, Defendants have not produced any slab to JSW's requirements or sold any to either Plaintiff.  As a result, Defendants have effectively strangled JSW's access to its critical slab feedstock, forcing JSW to reduce its production and to postpone the significant expansion of its Baytown facility.

15.     Defendants' agreements were intended to cripple JSW's ability to procure the domestic steel slab feedstock that would have permitted JSW to compete more effectively in the markets for finished steel plate and pipe.  On information and belief, Defendants undertook this coordinated boycott because they feared that a stronger JSW would win business from them in their core markets for finished steel plate, pipe, and coil—particularly following completion of JSW's Baytown expansion project and upgrades to the Mingo Junction mill, expansions that would have positioned JSW as a strong competitor for a range of federal, state, and private contracts.

16.     The immediate consequences of Defendants' anticompetitive conduct have been dramatic limitations of JSW's production of finished steel plate and pipe products, collapsing JSW revenues, significant cost increases to JSW from the imposition of tariffs on JSW's critical slab feedstock, and the forced delay of JSW's Baytown expansion project that would have added hundreds of jobs and billions of dollars to the southeast Texas economy and made JSW a much stronger competitor to Defendants in the United States.

17.     As a result of Defendants' conduct, JSW has suffered a significant slowdown of its business, affecting its customers and would-be customers throughout the United States.  JSW ultimately manufactured far less finished steel product than it would have absent Defendants' anticompetitive conduct, which allowed Defendants the freedom to avoid competition, raise prices, and reap the rewards of a booming steel market.  JSW was also forced to pay higher prices to acquire its slab feedstock, which made its pricing less competitive against that of Defendants.

18.     JSW has suffered antitrust harm in multiple ways:  First, JSW was forced to pay over $45 million in tariffs on steel slabs imported from abroad due to its inability to secure the necessary slabs from the domestic Defendants.  Second, Defendants' boycott meant that JSW was unable to procure domestic steel slab in sufficient quantity and quality to operate at planned levels

and to meet expected demand for pipe and plate products.  As a result, JSW was forced to limit its production, and this slowdown in its manufacturing operations resulted in hundreds of millions of dollars in lost sales and profits (and less competition for Defendants).  Third, JSW was forced to delay its major expansion project at its Baytown manufacturing facility, which not only led to millions of dollars in financial penalties as a result of delays and cancellations of contracts associated with the expansion project, but also caused JSW to miss a narrow regulatory window for the project.  This resulted in the loss of hundreds of millions of dollars in profits that JSW would have enjoyed as a result of increased production of finished steel plate and pipe products at a dramatically lower cost per ton at the upgraded facility during a time that steel prices were rising to historic levels, and other damages that are directly related to the conduct of the Defendants and their conspiracy.  Finally, Defendants' boycott has jeopardized JSW's access to capital markets and bank financing for future development projects.

19.    Defendants' boycott had its intended effect of significantly diminishing JSW as a competitor—a reality that Defendants took egregious advantage of.  Specifically, after JSW began to suffer significantly from the boycott, it announced an indefinite postponement of its Baytown expansion project.  Around the same time that JSW announced the delay of its plans, however, Nucor announced its own plans to build a new state-of-the-art steel plate mill.

20.    The broader consequence of Defendants' illegal conduct has been to restrict competition in the market for finished steel plate and pipe, and to prevent U.S. consumers from having access to the lower-cost, high-quality steel products that JSW would have manufactured at its significantly upgraded manufacturing facilities at Baytown and Mingo Junction.  As a result, U.S. purchasers of a wide range of steel products paid higher prices.

21.     Defendants have been able to reap the immense rewards of their cartel, particularly in light of historically strong pricing and demand in the steel industry.

22.     For example, AK Steel noted publicly that 2018 was "[o]ur best year in a decade" where profit rose $83 million, or 80%. Similarly, Cleveland-Cliffs finished 2018 with an adjusted EBITDA of $776 million, a "67% increase from the prior year." In 2019, Cleveland-Cliffs announced profits of $525 million "represent[ing] an industry best 28% EBITDA margin" and net cash flow from operating activities of $563 million, the company's "highest since 2013." With the acquisition of AK Steel and ArcelorMittal in 2020, Cleveland-Cliffs became "the largest flat-rolled steel company in North America" with fourth-quarter earnings up 158% from the previous year.

23.     In 2018, U.S. Steel was able to deliver its "best return on capital employed since 2008" with profits up $728 million, or 188%. In 2019, U.S. Steel was able to use the momentum from the year prior to acquire a 49.9% ownership interest in Big River Steel on October 31, 2019, at a purchase price of approximately $683 million in cash. On January 15, 2021, U.S. Steel exercised a call option to acquire the remaining 50.1% of Big River Steel for $723 million.

24.     Similarly, Nucor was able "to sum up 2018 [like] this: it was a record year" with profits up $1 billion, or 79%, compared with the previous year. Despite the "challenging steel market conditions" of 2019, that had impacted the earnings of each of Nucor's competitors, "Nucor generated record operating cash flow of approximately $2.8 billion." The unprecedented earnings continued through 2020, where Nucor again "set record[s] for profitability." Finally, in the first quarter of 2021, Nucor cited earnings of $942.4 million, or $3.10 per diluted share—making Q1 2021 "the best quarter in Nucor's history."

25.     By contrast, JSW continues to feel the effects of Defendants' illegal boycott to this day, as its sales and revenues were sent into a downward spiral from which it has not fully recovered, even in the current booming steel market, when the effects of Defendants' conduct became clear.

## JURISDICTION AND VENUE

26.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages, costs, and attorneys' fees for the injuries sustained by JSW because of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This action is also brought under the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code Ann § 15.01 et seq.; and for violations of common law prohibitions against civil conspiracy and tortious interference with existing and prospective business relationships.

27.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

28.     This Court may further exercise supplemental jurisdiction over JSW's state and common law claims pursuant to 28 U.S.C. § 1367 because the claims form part of the same case or controversy asserted under the Sherman and Clayton Acts.

29.     Venue is appropriate in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d) because during the relevant period, Defendants resided or transacted business in this District; for example, Nucor operates a joint and decking facility and transacts a substantial amount of business out of Houston, U.S. Steel operates a tubular facility and a research facility and transacts a substantial amount of business out of Houston, and Cleveland-Cliffs (through its wholly-owned subsidiary, AK Steel) transacts with numerous customers within this District each year.  Moreover, a substantial portion of the affected

commerce described herein was carried out in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District—for example, in the Spring of 2019, all three Defendants communicated directly with JSW personnel based in Baytown regarding the potential sale of slab.  Finally, JSW sustained injury and damages in this District.

30.     Defendants' conduct, as described herein, was within the flow of, was intended to have a substantial effect on, and did have a substantial effect on, the interstate commerce of the United States, including in this District.  As alleged herein, Defendants communicated directly with JSW personnel located at JSW Steel (USA), Inc.'s principal place of business in Baytown, Texas about the potential sale of slab to JSW—sales that never transpired as a result of Defendants' conspiracy.

31.     This Court has personal jurisdiction over each Defendant.  Each Defendant conducts business throughout the United States, including in this District, has maintained substantial contacts in this District, or, on information and belief, has committed overt acts in furtherance of the illegal scheme in this District.  For example, Nucor operates facilities and transacts a substantial amount of business out of Houston, U.S. Steel operates manufacturing and research facilities and transacts a substantial amount of business out of Houston, and both Cleveland-Cliffs and AK Steel transact with numerous customers within the District each year. Additionally, the scheme has been directed at, and has had the intended effect of, causing injury throughout the United States, including in this District.  For example, JSW Steel (USA) Inc. suffered direct and significant injury at its principal place of business in Baytown, Texas when it was forced to delay its $500 million expansion project, which resulted in financial penalties that were paid out of this District, lost profits, and other injuries in this District.

## PARTIES

32.     Plaintiff JSW Steel (USA) Inc. ("JSW Baytown") is a Texas corporation with its principal place of business in this District at 5200 East McKinney Road, Baytown, Texas 77523. Plaintiff JSW Baytown was injured and continues to be injured in its business in this District by reason of Defendants' illegal conduct forbidden by federal and state antitrust and other laws.

33.     Plaintiff JSW Steel USA Ohio, Inc. ("JSW Mingo Junction") is an Ohio corporation with its principal place of business at 1500 Commercial Avenue, Mingo Junction, Ohio 43938. Plaintiff JSW Mingo Junction was injured and continues to be injured in its business by reason of Defendants' illegal conduct forbidden by federal and state antitrust and other laws.

34.     Defendant Nucor is a Delaware corporation with its principal place of business at 1915 Rexford Road, Charlotte, North Carolina 28211.  Summons may be served upon its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Nucor is a leading domestic producer of sheet steel, plate steel, structural steel, bar steel, and steel coils. Notably, Nucor operates five sheet mills that produce flat-rolled steel for automotive, appliance, construction, pipe and tube and many other industrial and consumer applications.

35.     Defendant U.S. Steel is a Delaware corporation with its principal place of business at 600 Grant Street, Pittsburgh, Pennsylvania 15219.  Summons may be served upon its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808.  U.S. Steel is a fully integrated steel producer with operations in the U.S., Canada, and Europe, where it manufactures semi-finished steel slab that it uses to produce finished steel products, including sheet steel, steel plate, and steel coils.

36.     Defendant AK Steel is a Delaware corporation with its principal place of business at 9227 Centre Pointe Drive, West Chester, Ohio 45069.  Summons may be served upon its

registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  AK Steel is an integrated producer of flat-rolled carbon, stainless and electrical steels products, primarily for the automotive, infrastructure and manufacturing, and distributors and converters markets with manufacturing operations across seven states in the eastern United States, Canada, and Mexico.  On or around March 13, 2020, AK Steel was acquired by Cleveland-Cliffs Inc. ("Cleveland-Cliffs").  As of the acquisition, AK Steel became a direct, wholly-owned subsidiary of Cleveland-Cliffs, operating under the name AK Steel Holding Corporation.

37.     Defendant Cleveland-Cliffs is an Ohio corporation with its principal place of business at 200 Public Square, Cleveland, Ohio 44114.  Summons may be served upon its registered agent James D. Graham, 200 Public Square, Suite 3300, Cleveland, Ohio 44114. Cleveland-Cliffs is a fully integrated producer of custom-made iron ore pellets, flat-rolled carbon steel, stainless, electrical, plate, tinplate and long steel products, and carbon and stainless-steel tubing.

38.     Defendants U.S. Steel, AK Steel, and Cleveland-Cliffs are purportedly domestic manufacturers of steel slab in the size and chemistry that is the feedstock for JSW end products. Nucor is also a domestic manufacturer of slab, though Nucor uses that slab as part of its continuous manufacturing process and cannot offload to customers like JSW.  Each Defendant competes with Plaintiff JSW Baytown as manufacturers of plate and pipe products and with Plaintiff JSW Mingo Junction in steel coils that are sold within the infrastructure and transportation industries.

## FACTS

### I.   JSW is a Leading Manufacturer of Steel Plate and Pipe

39.   JSW is a U.S. manufacturer of carbon and certain discrete alloy steel plate, longitudinal submerged arc (LSAW) and double-submerged arc (DSAW) welded pipe, and hot-rolled steel coils.  It owns and operates facilities in Baytown, Texas and Mingo Junction, Ohio.

40.   JSW Baytown operates a plate mill and a pipe mill out of Baytown, Texas. The plate division purchases slab from merchant suppliers and rolls hot-rolled plates to order.  JSW sells these specialty plates to service shipyards, oilfield fabricators, heavy equipment producers, wind tower, railcar, storage tanks, and many other end users.  Additionally, the pipe division uses JSW plate to produce DSAW pipe (including large diameter pipe from 24" to 48") to service energy and petrochemical markets, including large diameter pipe for onshore and offshore use, heavy casing, and piling.

41.   JSW Baytown produces discrete plates up to 160 inches wide and in thicknesses ranging from 0.25 inch up to 6 inches thick.  These larger plates are used in applications that require fewer welds (which makes stronger pipe that can withstand greater pressures).  JSW's plate is therefore critical for many downstream products where welding is minimized to meet high structural integrity requirements, such as in shipbuilding, pressure vessels, and natural gas/oil transmission pipelines.

42.   JSW Mingo Junction operates an EAF, ladle metallurgy furnace, slab caster, and hot rolling mill to produce commodity hot-rolled coil bands.  JSW supplies these bands to coil processors, cold-rolled strip producers, pipe and tubers, original equipment manufacturers, and steel service centers.  Planned upgrades to the EAF and hot strip mill at Mingo Junction will position JSW to directly compete with Defendants in flat-rolled coil products, including in the automotive arena, pipe and tube segments, and galvanized and coated products.

13

43.     Importantly, JSW manufactures more than "commodity" steel products.  JSW's products must meet very specific customer requirements for characteristics such as rolled dimensions, yield, tensile strength, impact strength, toughness, grain size, and quality (including guaranteeing aspects of the slab manufacturing process to protect from such issues as air contamination and achieving strict Mannesmann ratings for defects).  JSW's mills are not equipped to modify these characteristics later in the manufacturing process. Instead, the mechanical properties required by JSW's customers are determined by the technical specifications of the slab at the beginning of the manufacturing process.

44.     Because JSW's customers often require plate that meets detailed specifications to fill their end-uses, the slab that JSW purchases (i.e., its raw material), must meet specific dimensional, chemical composition, and other technical specification requirements.  Therefore, JSW gives slab producers extremely precise specifications, and JSW cannot accept variance from those specifications without risking the integrity of the final product.

45.     Because many of JSW Baytown's customers use its Baytown products in high-pressure applications, such as to transport oil, natural gas, and other hazardous materials, JSW also strictly controls the technical specifications of the slab at the beginning of the process to ensure the highest quality standards.  JSW's slab feedstock and its plate products must meet rigorous standards and certification requirements.

46.     For example, many of JSW Baytown's products are ABS (American Bureau of Shipping) certified.  ABS certification requires approval of both the manufacturing process and the final product, as well as the use of feedstock from an ABS-approved slab supplier.  Other JSW products meet EN 10025 certification requirements specific to wind tower manufacturing, which guarantees that those products meet necessary strength and structural integrity requirements.  Still

other JSW products are certified by the American Petroleum Institute (API5L) and meet federal safety standards for use in natural gas pipelines.  Other JSW plate meets the Association of American Railroads' specifications for tank cars, which transport hazardous materials, such as chlorine, sulfuric acid, ethanol, and crude oil all over the country.

47.     In short, given the critical infrastructure that JSW Baytown's business, in particular, supports, product quality, strength, and internal soundness are paramount to ensuring public safety.

## II.   Defendants Produce Steel Products, Including a Critical Feedstock: Steel Slab

48.     Collectively, Defendants maintain approximately 84% of domestic steelmaking capacity.  Further, all Defendants compete with JSW as manufacturers of plate and pipe products that are sold within the infrastructure and transportation industries.

49.     Until late 2020, when Cleveland-Cliffs finalized its acquisition of AK Steel and ArcelorMittal, Nucor was the largest manufacturer of steel and steel products in the United States and has often touted its position "as the most profitable steel and steel products company in the world."  In fact, Nucor recently announced annual sales of approximately twice those of its nearest domestic competitor and revenue of $20.1 billion for fiscal year 2020.  At present, Nucor maintains approximately 31% of domestic steelmaking capacity, making it the second largest manufacturer in the United States.  Nucor operates in three distinct market segments: steel mills, steel products, and raw materials.  In the steel mills segment, Nucor produces sheet steel (hot-rolled, cold-rolled, and galvanized), plate steel, structural steel (wide-flange beams, beam blanks, H-piling and sheet piling), and bar steel.  Nucor sells its products primarily to steel service centers, fabricators, and manufacturers located throughout the United States, Canada, and Mexico.  The steel mills segment is Nucor's largest and is also where Nucor competes with JSW in the manufacturing of certain end-products, most notably steel plates.  Nucor operates three plate mills that produce plate for manufacturers of barges, bridges, heavy equipment, rail cars, refinery tanks, ships, wind towers,

and other items.  Nucor's products are further used in the pipe and tube, pressure vessel, transportation, and construction industries.

50.     U.S. Steel is currently the third largest steel producer in the United States and maintains approximately 19% of domestic steelmaking capacity and reported revenue of $9.7 billion for fiscal year 2020.  U.S. Steel operates integrated steel plants across North America that produce slabs, strip mill plates, sheets, and tin mill products, as well as iron ore and coke. U.S. Steel's flat-roll plants sell primarily to the automotive, appliance, construction, container, transportation, and service center markets.

51.     AK Steel is a leading producer of flat-rolled carbon, stainless and electrical steels, and tubular products, primarily for the automotive, infrastructure and manufacturing, and distributors and converters markets.  The company's operations consist of seven steelmaking and finishing plants located in Indiana, Kentucky, Ohio, and Pennsylvania that produce flat-rolled carbon steels, including coated, cold-rolled, and hot-rolled products, and specialty stainless and electrical slabs that are sold in slab, hot band, and sheet and strip form.  Before AK Steel was acquired by Cleveland-Cliffs in March 2020, it announced revenue of $47.2 million for fiscal year 2019.

52.     Cleveland-Cliffs acquired AK Steel in March 2020, thereby positioning it as a competitor of JSW in finished plates.  In or around December 2020, Cleveland-Cliffs also acquired ArcelorMittal USA.  With the acquisitions of AK Steel and ArcelorMittal, Cleveland-Cliffs holds approximately 34% of domestic steelmaking capacity, making it the largest steel producer in the United States.  Cleveland-Cliffs reported revenue of $5.4 billion for FY 2020.

## III.   **Relevant Market**

53.     The relevant product market is the market for domestically manufactured steel slab used in the production of finished steel plate and pipe products.  Defendants' conduct directly

targeted JSW's ability to acquire domestic steel slab for its manufacturing operations in the United States, including at its manufacturing facility located in Baytown, Texas. Defendants purport to manufacture steel slab at various facilities located throughout the United States but conspired to deny JSW a supply of steel slab manufactured at those facilities.

54.     The relevant geographic market is the United States, as Nucor, U.S. Steel and AK Steel all make slab in the United States, and U.S. Steel and AK Steel expressly stated that they could make it in sufficient quantities and qualities to satisfy JSW's needs within a short period of time, and that they were willing and able to sell it to JSW.   Nucor echoed their statements and certified that U.S. Steel and AK Steel were capable of making domestic slab sufficient to meet JSW's needs and were willing to sell it to JSW at commercially reasonable prices.  In addition, JSW competes with Defendants for sales of finished steel pipe, plate, and coil products to purchasers throughout the United States.  Moreover, Defendants' anticompetitive conduct had the intended and actual effect of causing harm to JSW's ability to buy domestically-made slabs and to its steel business throughout the United States, as their successful efforts to deprive JSW of domestically manufactured steel slab resulted in JSW's further inability to supply its customers throughout the United States with JSW's finished steel products.

## IV.    Prior to Defendants' Conspiracy, JSW Enjoyed Significant Growth

55.     Prior to the start of Defendants' anticompetitive conduct, JSW was experiencing strong growth in the sales of its finished steel plate and pipe products to steel purchasers throughout the United States.  Moreover, JSW was positioning itself to become a major domestic competitor to Defendants, with significant melt and manufacturer, flat-rolled, and steel coil capabilities that would have allowed JSW to compete toe-to-toe with Defendants in one of the strongest steel markets in history.  JSW's strengthening competitive position was the threat that Defendants conspired to fight.

56. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

57.     Even into early 2019, before JSW began to feel the full effects of Defendants'
unlawful conduct, JSW Baytown was able to take advantage of the significant increases in demand
and pricing for steel products in the United States. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

58. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

59.     Even at their combined annual revenue of roughly ██████████ on average for
fiscal years 2018, 2019, and 2020, JSW Baytown and JSW Mingo Junction are still a small fraction
of the size of Nucor, U.S. Steel, and Cleveland-Cliffs.  For example, Nucor's revenue over that
period ranged from $20 billion to more than $25 billion, U.S. Steel's annual revenue was between
roughly $10 and $14 billion over those years, and Cleveland-Cliffs ranged between roughly $2
billion and $5.2 billion.

**V.**   **In an Effort to Take Advantage of Its Strong and Growing Position, JSW Launched a Significant Expansion Plan in 2018 to Build a "Plate Mill of the Future" and Increase Its Production Capacity and Product Offerings To Challenge Defendants' Oligopoly**

60.     Beginning in 2007, JSW's parent company, JSW Steel Ltd. ("JSW India") began investing in the United States steel industry, most notably through the purchase of the then-bankrupt Baytown steel facility for $810 million in October 2007.  From 2014 to 2018, JSW India invested over $300 million to revive the 40-year-old Baytown mill by improving upon the existing infrastructure, incorporating new technologies, and enhancing the mill's safety controls.  As a result, sales out of Baytown increased steadily between 2015 and 2018.

61.     In March 2018, JSW announced a $500 million investment project in a "plate mill of the future" at its Baytown, Texas facility to build the most technologically advanced and eco-friendly EAF, slab caster, and plate mill in the world, thereby setting a new industry standard for steel plate mills. The investment was designed to transform JSW's Baytown facility into to the only melt and manufacture ("M&M") plate mill in the United States with a contiguous pipe mill capable of supplying large diameter welded steel pipe for oil and gas transmission.

62.     More importantly, the EAF that would be integrated into the Baytown facility would incorporate the most environmentally advanced EAF technologies in the world.  In fact, the "low-NOx" design of the EAF allowed JSW to obtain a New Source Review (NSR) Air Permit from the U.S. Environmental Protection Agency on September 14, 2018.  In order to retain that permit, however, JSW was required to place pilings and lay the foundation for the hot-end facility, as well as have all related contracts in place, no later than March 13, 2020.

63.     This start-of-the-art, low NOx EAF at Baytown would have been a trendsetter and would have set future standards for the installation, construction, and operation of EAFs for steel production throughout the United States.  Effectively, JSW and any third-party would have cited

the Baytown EAF as a Best Available Control Technology ("BACT") in all future permit applications for installation and operation of an EAF for steel production.

64.     JSW's announcement of the Baytown project came concurrently with JSW Baytown signing a Memorandum of Cooperation with the Governor Greg Abbott of Texas, whereby the Governor approved a $3.4 million grant to the company from the Texas Enterprise Fund.

65.     JSW's state-of-the-art expansion project was expected to add approximately 500 new jobs at JSW Baytown and hundreds of additional jobs in the Baytown, Texas community. The project was also projected to stimulate approximately at least $3.4 billion in economic development in and around South Texas.  Construction on the EAF and slab caster was anticipated to take 24 months, and when complete by January 2021, JSW would be the only steel producer in the United States with a contiguous EAF/caster capable of casting 8, 10, and 12-inch slabs, plate mill, and pipe mill.  The project was anticipated to add steel-making capacity equal to one million tons per year.  Prior to 2018 and during the period of construction of the new Baytown EAF/caster, however, JSW purchased imported carbon steel slab—primarily from ArcelorMittal in Mexico and JSW's parent company in India—to supply its mill in Baytown.

66.     Notably, the Baytown expansion project was just one part of an overall expansion project.  In addition to the Baytown project, in June 2018, JSW purchased a steel mill in Mingo Junction, Ohio from Acero Junction Holdings for $80.85 million and more than $100 million in assumed debt and liabilities.  On June 22, 2018, JSW announced plans for a two-phase ramp-up plan: in the first phase, JSW intended to revamp and restart the EAF and slab caster at the Mingo Junction location and modernize the hot strip mill.  The proposed investment, including the cost of acquisition, was announced to be around $250 million.  In the second phase, JSW planned to

add another EAF and manufacturing equipment at the hot strip mill to make the Ohio facility a fully integrated unit in the production of steel coils. The proposed investment in Phase-II was also anticipated to be in the range of up to $250 million.

67.     The Mingo Junction and Baytown projects together positioned JSW to compete more strongly and even more directly with Defendants across a range of finished steel plate, pipe, and coil products.

68.     In anticipation of these expansion efforts, JSW entered into several contractual arrangements for services and equipment.

69.     For example, in or around June of 2017, JSW entered into a two-phase Equipment Supply Contract with Danieli Corporation ("Danieli").  The first phase of the Danieli contract was to replace the primary descaler, hot plate leveler, and plate shearing line at Baytown at a contract value of approximately ████████.  In the second phase, Danieli contracted to replace the reverse rolling mill, install a pre-leveler and cold plate leveler, direct quenching and accelerated cooling technologies, and fully replace the cooling beds at a contract value of approximately ████████. On or around August 23, 2018, JSW entered into a Supply Contract for Equipment and Continuous Slab Caster with Primetals Technologies USA LLC ("PTUS") at a total contract value of approximately ████████.  The following month, JSW executed an Equipment Supply Contract with Tenova S.p.A. ("Tenova") to supply and service the low-NOx melt shop technology for the M&M contiguous plate and pipe mill at Baytown at a total contract price of approximately ████ ████  On or around October 5, 2018, JSW entered into a Construction Manager Adviser Agreement with Middough Inc. to oversee the bridge table installation and basalt lining of the flume, shifting of hot leveler, dismantling and installation of descaler, modification of area roller table, and pre-assembly and installation of new sheets at Baytown for a total contract value of

approximately ███████.  On or around December 18, 2018, JSW entered into an Engineering Services Agreement with Dastur International ("Dastur") for services to be rendered in the installation of the new Baytown melt shop at a total contract value of approximately ███████. On or around March 2, 2019, JSW entered into a Contractor Agreement with Fisk Electric Company to provide electrical installation services to the Baytown project at a total contract price of approximately ███████.  On or around April 29, 2019, JSW entered into a Contractor Agreement with CCC Group, Inc. to build a descaler and install a temporary bridge table at Baytown for a total contract value of approximately ███████.  Together, this sampling of supply and services contracts that JSW entered into between 2017 and 2018 total over $150 million.

70.     JSW anticipated that its expansion project at Baytown, in particular, would, upon completion, provide a giant technological leap forward in its manufacturing capabilities, and would help to establish JSW as a major player in the domestic steel market—and a significant rival to each Defendant.  The expansion project was intended to dramatically increase JSW's manufacturing efficiency by eliminating the need for JSW to import steel slab for its plate and pipe products, and to drive down its manufacturing costs.  Moreover, the technological advances would allow the Baytown facility to receive the appropriate approvals by energy companies that require more robust assurances in order to service government-funded projects.  Within the year, the facility had already received preliminary approval from a number of energy companies and the relevant environmental agencies, which allowed it to be added to a database that these energy companies could turn to when purchasing steel for government-funded projects.

71.     The completion of the Baytown project was a highly anticipated event for these energy customers, who had limited access to steel that meets the high environmental standards that

government-funded projects require.  For instance, one JSW customer that competes for these government contracts noted that it "**would love to have another option for our heavy plates**." Other similarly situated customers anticipated that the Baytown project "**will be a game changer**" and that it would "**open the flood gates**."  Yet another customer told JSW that its "**offtake from [JSW] could quadruple**" upon completion of the project.

72.     In addition, the Baytown expansion project positioned JSW to enter into new, or expand upon existing, business relationships with customers, including private customers as well as state and federal governments in connection with defense, energy, and infrastructure projects for the purchase of finished steel products that JSW would have been able to manufacture at its Baytown, Texas facility following JSW's planned expansion and upgrade projects.  For example, JSW was in discussions with numerous companies and was well-positioned, following the Baytown expansion project, to provide products such as: (1) heavy plate for large wind towers; (2) as much as 30,000 tons per month of shell plate for tank rail cars; (3) heavy plate for infrastructure projects such as bridges; and (4) heavy plate for commercial ship building.

73.     Consequently, JSW expected to reap a significant return on its capital investments—returns which it would then plow into increasing its production output and which would have yielded substantial pricing improvements for JSW customers.  For instance, JSW anticipated that the EAF installation at its Baytown facility would result in an ███████ reduction in its per-ton manufacturing costs associated with casting of slabs and plate conversion for its steel plate products, with an annual savings of approximately ██████████ in manufacturing costs.  JSW also projected that, following completion of the Baytown expansion project, Baytown's annual production of both plate and pipe products would increase by over 100%.  The combination of

substantially increased production capacity at lower costs would have allowed JSW to sell more plate and pipe products at lower prices to its U.S. customers.

74.     JSW's parent company, JSW India, similarly anticipated that the Baytown expansion project would yield significant financial benefits, and was prepared to invest hundreds of millions of dollars in the financing of the project with the expectation that the completed project would allow JSW to expand its share in the finished plate and steel markets and to compete effectively for a range of federal and state government contracts.

75.     JSW anticipated significant revenue enhancements following the completion of its expansion projects.  For example, at the time it initiated its Baytown project, JSW projected that its annual cash flow would increase by approximately ████████ as a result of the expansion. But these projections were ultimately conservative in light of the historically strong pricing and demand that the steel industry has experienced in the time following the original completion date of the Baytown expansion project (March 2020); had the project been completed on time—as JSW expected it would have been absent Defendants' group boycott—JSW projected that its revenues would have exceeded ██████ annually.  This increase in revenue would have flowed, in substantial part, from increased and more efficient production at the Baytown facility, thus better positioning JSW Baytown to serve an expanded base of customers in a market that is experiencing historically strong demand.

76.     The improvements to its business operations would have also put JSW in position to compete in new end-use segments, including in additional segments against Defendants.  For instance, JSW envisioned that the planned expansion projects—and, in particular, the installation of the EAF at its Baytown facility—would allow it to start to compete directly with Defendant Nucor for federally funded infrastructure projects that require all steel products to be melted and

manufactured in the United States.  Particularly given the discussions within the federal government in recent years regarding legislation directed to major infrastructure improvements throughout the country, this market could prove to increase in size by hundreds of billions of dollars in the coming years.

77.    Further, the addition of another EAF and manufacturing equipment at the hot strip mill in Mingo Junction has improved JSW Mingo Junction's capacity and cost structure significantly, thereby positioning JSW Mingo Junction to make hot-rolled coil bands at quality and levels that directly compete with the Defendants.

78.    It was widely publicized that JSW's expansion projects would, upon completion, position JSW as a major competitor for plate and pipe and flat-rolled coil purchases, as well as for federally funded projects.  The expansion projects would also have allowed JSW to become a more efficient competitor that could offer its finished steel products to domestic customers at lower prices.  Defendants therefore had an interest in kneecapping JSW's expansion efforts—which they accomplished through their coordinated efforts to deprive JSW of domestic steel slab.  By forcing JSW to purchase steel slab from international suppliers that were subject to tariffs and quotas, Defendants were able to dramatically increase JSW's manufacturing costs while limiting the availability of slab feedstock to JSW, which in turn led to slowdowns in JSW's production and severely hindered JSW's ability to sell its finished products at competitive prices.

## VI.    President Trump Announced a Steel Tariff Scheme and Quotas Limiting Domestic Imports of Steel From Certain Countries in March 2018, Effectively Creating a Domestic Slab Market

79.    In March 2018, former President Trump, acting pursuant to Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862, as amended), issued a Proclamation imposing a tariff of 25% on the majority of all steel imports.

80.     Later in March 2018, former President Trump, again acting pursuant to Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862, as amended), issued a Proclamation that exempted certain countries from the 25% tariffs but imposed quotas limiting the imports of steel from those countries.  Among those countries for which quotas were imposed were Brazil and Mexico, both countries from which JSW had sourced significant volumes of semi-finished steel slabs in the years prior to 2018.

81.     The imposition of such tariffs and quotas limiting imports from Brazil, Mexico, and other countries effectively created a domestic slab market, forcing companies like JSW to turn to domestic rather than international sources for their slab needs.

82.     Perhaps in recognition of the fact that domestic slab may not always be available in sufficient quantity or quality to meet the needs of companies like JSW, the Trump Administration authorized the U.S. Department of Commerce ("Department of Commerce") to grant U.S. businesses tariff exemptions for imported steel products that could not be sourced domestically. The exemption request process also allows other companies to object to an exemption request if the objector can demonstrate that the requestor can obtain the steel product it seeks from a domestic source, in sufficient quantity, within eight weeks.

83.     Defendants professed uniform support of the tariffs and an interest in protecting the U.S. domestic steel industry, as did JSW and most all the domestic steel industry.  For example, in testimony before the Ways and Means Committee of the U.S. House of Representatives, AK Steel's Chief Executive Officer Roger Newport applauded the Trump Administration for taking "bold action to impose tariffs on foreign steel under the Section 232 investigation," an action that he said AK Steel "fully support[s]."  In March 2018, Nucor then-CEO John Ferriola praised the Administration's efforts in "restoring a level playing field" in the domestic steel industry. U.S.

Steel CEO David Burritt mirrored these sentiments in December 2018, expressing support for the tariffs as an avenue for "level[ing] the playing field so that we can have fairer trade."

84.     Nevertheless, on information and belief, what Defendants were actually interested in was *not* leveling the playing field to protect and advance the U.S. steel market but rather using the process to protect ***their own market positions***.

85.     This interest—protecting their own market positions—motivated Defendants' conspiracy to boycott JSW.  In fact, Defendants worked in parallel, submitting over 14,000 objections to exemption requests filed by JSW and a number of other competing steel companies between March 2018 and January 2021 in order to maintain a grip on their market positions.  In nearly every one of these submissions, Defendants took the position that the relevant slabs were domestically available—from U.S. Steel and AK Steel—and asserted this point as the core basis for their objections to the exemption requests.

## VII.   Defendants Acknowledged They Began "Working Together" In 2018 and Have Held Numerous Joint Meetings Since Then At Which They Hatched and Implemented Their Conspiracy

86.     Although conspiracies are inherently self-concealing and JSW does not currently possess details on what was discussed at each of Defendants' numerous meetings throughout the period from 2018 to the present, their conspiracy can be inferred from the frequency and timing of such meetings, Nucor's ***admission*** (via its authorized representative) that the Defendants were "working together," and their repeated conduct against their ***admitted*** self-interest.

87.     On or around March 1, 2018, Defendants' CEOs, David Burritt of U.S. Steel, Roger Newport of AK Steel, and John Ferriola of Nucor, met together at the White House for a face-to-face meeting and press conference with then-President Trump to announce the tariffs.



**March 1, 2018 White House Meeting.** *Attendees from left to right*: Roger Newport (CEO, AK Steel), John Ferriola (then-CEO, Nucor), Former President Donald J. Trump, David Burritt (CEO, U.S. Steel)

88.     Three weeks later, on March 21, 2018, John Ferriola of Nucor and Roger Newport of AK Steel were together in Washington, D.C. for testimony before the Congressional Steel Caucus.

89.     On May 23, 2018, representatives from Nucor, U.S. Steel, and AK Steel met again.

90.     Defendants met again in late summer.  On August 29, 2018, representatives from Nucor and U.S. Steel met again. As discussed *infra*, on August 30, 2018, both Nucor and U.S. Steel filed statements with the Department of Commerce. U.S. Steel certified that it could and would sell slab to JSW and Nucor certified that U.S. Steel and AK Steel could do so at commercially reasonable prices.

91.     On September 6, 2018, representatives from Nucor and U.S. Steel met yet again after Nucor's representative made the following admission: "We spoke with Nazak Nikakhtar [Department of Commerce] a few weeks ago about possible changes to the steel Section 232 exclusion process. Last Friday she suggested that we also meet with Earl [likely Earl Comstock,

Department of Commerce] to discuss this issue. ***Ideally, the meeting would be with both Nucor and U.S. Steel because both companies have been working together***."

92.     On information and belief, Defendants participated in additional meetings during the period from 2018-present.  For example, in October 2018, John Ferriola (Nucor then-CEO) and Roger Newport (AK Steel CEO) were both present at the World Steel Association General Assembly meeting in Tokyo, Japan.  On June 4, 2019, Roger Newport and John Ferriola attended an American Iron and Steel Institute and Steel Manufacturers Association media event at the InterContinental Hotel in Washington, D.C.  On June 17-19, 2019, Eric Welte (AK Steel General Manager), Roger Newport (AK Steel CEO), Dean Kanelos (Nucor Market Development and Product Applications Manager), and Lourenco Goncalves (Cleveland-Cliffs CEO) were all in attendance at a Fastmarkets event held at the New York Hilton Midtown.  In August 2019, representatives from AK Steel, U.S. Steel, and Nucor were present at the SMU Steel Summit event in Atlanta, Georgia.  In October 2019,  Roger Newport (AK Steel CEO) and John Ferriola (Nucor then-CEO) were together at the World Steel Association General Assembly meeting in Monterrey, Mexico and in October 2020, David Burritt (U.S. Steel CEO) and Leon Topalian (Nucor CEO) attended the same annual event hosted in Brussels, Belgium.

**VIII.    <u>Shortly After Their Joint Meetings Began, Defendants U.S. Steel and AK Steel Simultaneously Certified Under Penalty of Criminal Prosecution That They Were Capable of Producing Domestic Slab In Sufficient Quality and Quantity to Meet JSW's Needs, and Defendant Nucor Echoed Them and Confirmed It Knew That Its Rivals Were Willing To Sell Slab to JSW On Commercially Reasonable Terms</u>**

93.     As noted above, the Section 232 tariff system included a process by which companies could seek exemption from tariffs in the event they could not obtain necessary steel from a domestic source in sufficient quantity or quality.  JSW—with its Baytown expansion project underway in 2018 and knowing of no domestic sources for slab meeting its criteria—anticipated that it would need a temporary tariff exemption.  ***Defendants, however, uniformly and***

*simultaneously proclaimed under penalty of criminal prosecution, that U.S. Steel and AK Steel could supply all of JSW's slab needs and that it was in their self-interest to do so*.

94.     On or around May 29, 2018, AK Steel made a certified statement to the Department of Commerce that it could meet JSW's demands for slab that it would otherwise import from India. Before AK's statement was public, both U.S. Steel and Nucor echoed AK Steel in their own statements to the Department of Commerce.  These statements by U.S. Steel and Nucor were made before AK Steel's statement from two days earlier had even been made public.  U.S. Steel certified that it could meet JSW's demands for slab that JSW would otherwise import from India.  Nucor, for its part, not only certified that it knew that both U.S. Steel and AK Steel could do so, but that they were willing to sell slab to JSW at "*commercially reasonable prices*."  On information and belief, Nucor must have communicated with U.S. Steel and AK to be able to say—nearly simultaneously with U.S. Steel and AK Steel's statements, but before those statements were public—that it knew U.S. Steel and AK Steel could make and would sell slab to JSW at commercially reasonable prices.

95.     A nearly identical process played out two months later.  In late August 2018, AK Steel certified that it had the ability and capacity to manufacture the slab that JSW would otherwise import from Mexico.  Again, *two days later*, *both* U.S. Steel and Nucor made parallel statements on or around August 30, 2018.  And again, U.S. Steel's and Nucor's statements were made before AK Steel's statement from two days prior was made public.  Notably, simultaneous August 30, 2018 statements by U.S. Steel and Nucor came *one day* after all three Defendants met on August 29, as noted above.

96.     Defendants' statements were plainly coordinated.  ***Importantly, AK Steel and U.S. Steel each claimed it had the ability and capacity to manufacture the slab JSW would otherwise import from international sources***.

97.     For instance, AK Steel repeatedly stated that AK Steel "***has the ability to produce***" the slab JSW needed—including to the precise thickness and widths and exacting chemistries that JSW required.  Moreover, AK Steel represented that it could ***timely*** manufacture up to ***100% of JSW's slab requirements*** and could manufacture and ship the slab products to JSW ***within 8 weeks*** of receiving a purchase order.

98.     U.S. Steel, for its part, represented in its certified statements that it had "a very clear understanding of the quality and delivery parameters required for JSW" and could fully supply JSW.  U.S. Steel went so far as to state that it "***produces the entire spectrum of grades and dimensions of steel slabs identified in JSW's requests and has significant excess production capacity and is able to meet 100% of the volume cited***" by JSW.

99.     Meanwhile, in its own certified statements—which were submitted *on the same day* as U.S. Steel's, and only two days after AK Steel's—Nucor made the remarkable confirmation that other domestic steel producers, including U.S. Steel and AK Steel could supply JSW with its needed slab.  Indeed, Nucor declared that U.S. Steel and AK Steel "***are ready and willing to supply JSW with the slab*** (as well as the plate produced from that slab) ***at commercially reasonable prices***."  Nucor's certified assertions that its *competitors* could supply JSW's slab needs were not in Nucor's apparent self-interest.  But Nucor's statement, which it could only have learned from communicating with its competitors U.S. Steel and AK Steel, was directly in line with its actual motivations: to hamstring JSW's efforts to establish itself as a major competitor to Nucor in the U.S. market for finished plate and steel products.

100.     Further, Nucor could only certify under penalty of criminal prosecution that it *knew* U.S. Steel and AK Steel could manufacture and would sell slabs to JSW on commercially reasonable terms if it had communicated with them in advance of their respective submissions. This is because the capabilities of AK Steel and U.S. Steel are confidential and highly proprietary; indeed, both companies have historically sought to protect all details regarding their manufacturing capacities and technologies.  For example, in a 2010 lawsuit against three former employees for violations of confidentiality agreements and stealing trade secrets before going to work for a competitor, AK Steel noted in its complaint that it "has invested substantial amounts of money to develop and protect these proprietary manufacturing technologies, which would be of great value to a competitor."  In 2016, U.S. Steel filed a complaint before the United States International Trade Commission under Section 337 of the 1930 Tariff Act against several steel manufacturers and distributors for, among other antitrust allegations, the theft of U.S. Steel trade secrets.  Throughout the complaint, U.S. Steel references the "confidential and proprietary" nature of its products, pricing, and production capacity.

101.     More importantly, both U.S. Steel and AK Steel have re-asserted in their certified statements that their production capacity, plant utilization, and lead times are business proprietary information that is not customarily made available to the public.

102.     Upon information and belief, given the proprietary nature of AK Steel and U.S. Steel's product, pricing, and production capacities, Nucor would have no way of knowing at what prices and in what quantities U.S. Steel and AK Steel would or would not be able to sell slab to JSW absent consultation and/or coordination with them.  On information and belief, as part their group boycott conspiracy, AK Steel and U.S. Steel communicated with Nucor regarding their

product, pricing, and production capacities as part of their plan to cripple JSW's business by denying JSW a domestic supply of slab feedstock that was essential for its operations.[1]

## IX.   Defendants Stated It Was In U.S. Steel's and AK Steel's Self-Interest To Supply JSW with Domestic Slab on Commercially Reasonable Terms

103.   Defendants Nucor, U.S. Steel, and AK Steel certified *within the span of two days* (and, in the case of Nucor and U.S. Steel, on the *exact same day*) that U.S. Steel and AK Steel were able and willing to supply JSW with its critical slab feedstock on a timely basis, in the quantities and at the quality needed by JSW, and at commercially reasonable prices.  Indeed, Defendants AK Steel and U.S. Steel stated that they were able and willing to manufacture and supply JSW with *100%* of its required slab—and further admitted that it was in their economic self-interest to do so.

104.   AK Steel not only certified that it could provide JSW with its required slab but also that that *its relevant manufacturing facilities were being utilized below capacity, meaning that AK Steel could increase its facility utilization to immediately manufacture products for JSW*.

105.   U.S. Steel, for its part, stated that it "has displayed a *willingness across all market conditions to sell*" steel slab to JSW, and even admitted that it "*has enormous incentive*" to supply JSW.  Moreover, U.S. Steel identified no fewer than *five* of its manufacturing facilities where it could manufacture slab that it claimed would meet JSW's requirements.

106.   Moreover, Defendant Nucor specifically echoed AK Steel's and U.S. Steel's claims that they could supply JSW with slab that satisfied the exacting technical specifications that JSW

---

[1] Because AK Steel and U.S. Steel maintain that their manufacturing processes and capabilities are confidential, JSW does not know the extent to which these Defendants are actually able to manufacture steel slab to the specifications that JSW requires.  However, if AK Steel and U.S. Steel are in fact incapable of manufacturing the slab that JSW requires, then their agreed-upon and near-simultaneous statements to the Department of Commerce amounted to material and fraudulent misrepresentations.

required—despite AK Steel's and U.S. Steel's stated positions that the specifics of their manufacturing processes were confidential and not publicly known.

**X.**    **Despite Defendants' Near-Simultaneous Admissions that It Was in AK Steel's and U.S. Steel's Self-Interest to Sell Slab to JSW, They Failed to Do So**

107.    In 2019, following all Defendants' certified statements that AK Steel and U.S. Steel could meet all of JSW's slab needs, JSW separately reached out to AK Steel and U.S. Steel. Pursuant to their illegal agreement, however, and in furtherance of their admitted plan of "working together" that was developed in their many meetings throughout 2018 and 2019, Defendants conspired to deny JSW access to domestically-manufactured steel slab by failing to sell slab.

108.    Defendants did so despite the fact that U.S. Steel and AK Steel certified in 2018 that they were ready and able to manufacture and supply JSW with 100% of its steel slab requirements, and to do so on a timely basis and at commercially reasonable prices—which Nucor confirmed in its own certified statements.  Defendants acted contrary to their expressed economic self-interest in refusing to supply JSW.  This refusal illustrated the purpose and intent of their boycott—namely, to directly and substantially harm a competitor with the goal of diminishing a burgeoning threat to their businesses.

109.    Astonishingly, after months of meetings and after repeated statements that they had the ability and capacity to supply JSW with slab made to its particular specifications, AK Steel and U.S. Steel provided near-simultaneous responses to JSW's inquiry for slab, asking JSW for the first time ever to prove its creditworthiness as a condition of engagement.

110.    For example, on May 8, 2019, Mr. Sanjay Pipalia (JSW's Baytown CFO), sent a "firm inquiry" to AK Steel for 10-12 inch thick continuous cast carbon slab.  Mr. Pipalia included attachments with JSW's detailed specifications, tolerances, and chemistries for the requested slab.

111.   As a condition to even engaging, however, AK Steel for the first time demanded that JSW complete a credit application.  In fact, JSW was informed by a May 13, 2019 email from Rich Pinson (AK Steel's General Manager for products) that the credit application would "***need to be completed before a slab proposal can be issued***."   JSW was also asked to share its confidential financial statements.  Although Mr. Pipalia offered to provide AK Steel with a documentary letter of credit in lieu of sharing its confidential financial statements, as a means of proving its creditworthiness, Mr. Pinson informed him that "[w]ithout financial statements, AK Steel would be unable to extend open terms for a 30,000 NT slab purchase."

112.   In an email dated May 30, 2019, Mr. Pinson rejected Mr. Pipalia's offer of a documentary letter of credit, indicating it was "not an arrangement we find suitable" and requiring a standby letter of credit written on a U.S. bank.  On information and belief, AK Steel's request for credit information was a pretext intended to provide AK Steel a purported financial basis on which to reject JSW's business when, in reality, its refusal to sell domestic slabs to JSW resulted from its conspiratorial agreement with the other Defendants.

113.   On June 5, 2019—nearly a month after JSW's request—Evin Hatch (an AK Steel associate product specialist) sent Mr. Pipalia an exception sheet detailing the technical specifications that AK could and could not meet.  According to the exception sheet, "***AK Steel MW will provide 9" slabs. AK Steel Dearborn will provide 8" slabs***," indicating that AK Steel would not provide 10" or 12" slab as requested by JSW.  The exception sheet ran contrary to AK Steel's certified statements that it "***has the ability to produce***" the products subject to JSW's exemption requests—including to the sizes and exacting chemistries that JSW required.

114.   Against its stated willingness and self-interest in supplying slab to JSW, AK Steel ultimately did not supply the slab JSW requested.

115.    JSW also attempted to obtain slab from U.S. Steel during this period and was met with a nearly identical request by U.S. Steel for proof of creditworthiness.  On May 8, 2019, Mr. Pipalia sent U.S. Steel the same firm inquiry for 10-12 inch thick continuous cast carbon steel slab. Mr. Pipalia included the same spec sheet and additional attachments with detailed specifications, tolerances, and chemistries.

116.    In parallel with AK Steel (indeed, in the same month as AK Steel's similar demand), U.S. Steel attempted to make an issue of JSW's credit as a precondition to slab supply. For example, on May 21, 2019, Mr. Oster of U.S. Steel informed Mr. Pipalia that JSW would need to complete paperwork from U.S. Steel's credit department "to establish a line of credit for the sale."  In fact, the U.S. Steel credit department sent Mr. Pipalia an email that same day saying that U.S. Steel needed "to do a full credit review and application process."  In addition to the credit application, U.S. Steel requested JSW's audited financial statements for the last two years.  On information and belief, U.S. Steel's request for credit information—much like AK Steel's—was a pretext intended to provide U.S. Steel a purported financial basis on which to reject JSW's business when, in reality, its refusal to sell domestic slabs to JSW resulted from its conspiratorial agreement with the other Defendants.

117.    On May 31, 2019, Mr. Lohr of U.S. Steel emailed Mr. Pipalia U.S. Steel's list of deviation requests and comments on JSW's slab order.  The deviations list noted that U.S. Steel could not currently produce JSW's requested 12" slab, but that "with enough volume commitment," one of its casters at its Gary, Indiana facility could produce 12" slabs "***with a 3 month lead time***."  It also noted that the mill in Fairfield, Alabama slated to produce the 10" slab requested by JSW was currently idle and would "***become available once our EAF project there is complete.  Current construction schedule shows completion in late 2020***"—*i.e.*, approximately

18 months in the future.  The U.S. Steel exceptions list also identified many other chemistry deviation requests and requested dimensional tolerances—in fact, almost every chemical element range was altered.  The exception sheet also ran contrary to U.S. Steel's certified statements that it (1) had "a very clear understanding of the quality and delivery parameters required for JSW," (2) could fully supply JSW should the exemption requests be denied, and (3) "***produces the entire spectrum of grades and dimensions of steel slabs identified in JSW's requests and has significant excess production capacity and is able to meet 100% of the volume cited***" in JSW's exemption requests.

118.    Against its stated willingness and self-interest in supplying slab to JSW, U.S. Steel ultimately did not supply the slab JSW requested.

## XI.    JSW Baytown's Revenue Plummeted as Defendants' Boycott Continued

119.    As described above, JSW Baytown was experiencing significant financial improvement and sales growth from 2016 through 2018, the year Defendants hatched their conspiracy.  However, JSW Baytown's upward trajectory came to a grinding halt as a direct consequence of Defendants' coordinated efforts to foreclose any domestic steel slab purchases.  Without the ability to acquire its critical steel slab feedstock in the domestic market, JSW Baytown had to curtail its production of plate and pipe products substantially and its slab acquisition costs dramatically increased starting in 2018. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████     JSW Baytown's inability to buy sufficient quantities of semi-finished steel slab from Defendants, coupled with the restrictions on

imports caused by the quotas and tariffs, forced the company to dramatically reduce its production of finished steel plate and pipe products for its customers—the consequence of which was to put JSW Baytown into a steep downward spiral, as it was unable to fully supply customers and could not compete effectively for new customers, with resulting steep declines in sales and revenues.

120.    The effects of Defendants' illegal boycott on JSW Baytown's revenues was stark. JSW Baytown's sales revenue began to crater in 2019, after U.S. Steel and AK Steel rejected JSW Baytown's efforts to purchase slab from them and the effects of Defendants' group boycott began to take full hold of JSW's supply chain and manufacturing operations.  Indeed, at a time when the domestic steel market was experiencing record-high prices and increased demand, JSW Baytown's overall volume sold was severely curtailed, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

121.    The following year was even worse:  JSW Baytown's volume of plate and pipe produced dropped further, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

122.    Although the steel industry as a whole contended with collapsing prices and a reduction in sales revenue in 2019—as well as in 2020 following the global market recession caused by the COVID-19 pandemic—JSW Baytown's sales were particularly hindered by its inability to secure steel slab in the domestic market.

## XII.   The Conspiracy Forced Delay of JSW's Planned Baytown Expansion

123.   As a result of Defendants' refusal to sell domestic slab to JSW, JSW has been unable to obtain the domestic slab it requires for its products and was forced to delay its Baytown expansion project, originally projected to be complete in January 2021.

124.   In August 2019—shortly after U.S. Steel and AK Steel refused to sell slab to JSW, despite repeatedly stating under oath they could and would—JSW was forced to announce that it was putting on hold the plans to construct a new EAF and slab caster at its Baytown, Texas facility.

125.   In August 2019, JSW terminated its August 2018 Supply Contract for Equipment for Continuous Slab Caster with PTUS.  On or around the same day as the PTUS termination, JSW terminated its September 2018 Equipment Supply Contract with Tenova to supply and service the low-NOx melt shop technology for the melt-and-manufacture contiguous plate and pipe mill.  On or around October 7, 2019, JSW submitted a partial termination to Danieli for the June 2017 Equipment Supply Contract.  As a result of JSW's terminations, the contracting parties passed on various delay-related costs to JSW, including but not limited to, fees associated with storage, handling, and preservation costs for the equipment.  As of the filing of this complaint, JSW has been invoiced for over $20 million in termination fees and is potentially exposed to even greater amounts.

126.   The delay also caused JSW to miss the March 13, 2020 deadline for placing pilings and laying the foundation for the hot-end facility, as well as having all related contracts in place in order to retain the NSR Air Permit from the U.S. Environmental Protection Agency.

127.   In addition to forcing JSW to postpone the Baytown expansion, Defendants' boycott also forced JSW to curtail its existing operations dramatically due to its inability to buy sufficient quantities of the critical feedstock, domestic steel slab.  On or around September 15, 2020, JSW was forced to idle its Baytown, Texas mill and announced that about 270 employees at

Baytown would be laid off as a result.  JSW CEO Mark Bush stated, "Due to recent changes to the quota for import of semi-finished steel . . . JSW is no longer able to purchase the slabs needed to support our operations or customers for the remainder of 2020."

128.    JSW re-opened the Baytown facility in February 2021 but has been forced to operate at less than 50% of its production capacity due in substantial part to JSW's inability to acquire domestic steel slab—an inability which is a direct consequence of Defendants' illegal boycott.

129.    Moreover, the damage done to JSW's business operations as a result of the idling and slow return to production at Baytown has been immense.  JSW projected that it would be able to manufacture 750,000 tons of finished steel plate and 180,000 tons of finished steel pipe annually at the Baytown facility following completion of the expansion project.  But JSW's actual production is far lower.  ███████████████████████████████████████████ ██████████████████████████████ and it further projects similar volumes for the current fiscal year— the first in which the Baytown facility would have been fully operational with its state-of-the-art mill absent Defendants' conduct.  JSW's plate production has also been, and is projected to be, dramatically lower than it would have been absent Defendants' conduct that delayed the Baytown expansion, with best-case scenarios still projecting ████████████████████████████ ████████████████████████████ post-Baytown expansion.

130.    Additionally, JSW has lost substantial profits as a result of the delay of the Baytown expansion project.  ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Moreover, and particularly in the current booming market for steel pricing and demand, JSW could have expected increasing sales and income growth in

subsequent years on top of its initial estimates.  But JSW now expects to realize ███████ of

that income projection in the first year following what would have been the completion of the

Baytown expansion absent Defendants' conduct.  JSW expects that these lost profits will continue

for years to come, as the delay in the Baytown expansion project has set JSW far back in relation

to its competitors in a booming steel market.

131.    As of the filing of this complaint, JSW does not know when the Baytown expansion

project will be completed.  The delay of JSW's expansion efforts was a direct consequence of

Defendants' illegal boycott, and had the effect of obstructing the creation of hundreds of jobs in

this district, as well as crippling JSW's efforts to significantly expand its production capacity to

serve critical infrastructure projects throughout the United States.

## XIII.    Defendants Enjoyed Record-Breaking Financial Success In Contrast To The Harm They Caused JSW's Business

132.    Meanwhile, each of the Defendants touted record profits beginning in 2018.

133.    For example, AK Steel heralded record earnings in the company's 2018 investors

call, where CEO Roger Newport reported a "generated net income of $200.5 million" representing

the company's "best year in a decade."

134.    Similarly, Cleveland-Cliffs finished 2018 with an adjusted EBITDA of $776

million, a "67% increase from the prior year."  In 2019, Cleveland-Cliffs announced profits of

$525 million "represent[ing] an industry best 28% EBITDA margin" and net cash flow from

operating activities of $563 million, the company's "highest since 2013."  With the acquisition of

AK Steel and ArcelorMittal in 2020, Cleveland-Cliffs reported fourth-quarter earnings up 158%

from the previous year.  In the first quarter of 2021, Cleveland-Cliffs announced profits of $513

million, representing a 79% increase over the previous quarter, while projecting a nearly 200%

rise in profit to $1.2 billion in Q2 2021.

135.    For fiscal year ending December 31, 2018, U.S. Steel reported to investors a "return on capital employed of just over 20%, our strongest performance since 2008." Despite reporting a loss in 2019, U.S. Steel used the momentum from the year prior to acquire a 49.9% ownership interest in Big River Steel on October 31, 2019, at a purchase price of approximately $683 million in cash. On January 15, 2021, U.S. Steel exercised a call option to acquire the remaining 50.1% of Big River Steel for $723 million.

136.    During Nucor's 2018 earnings call, then-CEO John Ferriola told investors that "[i]t was a record year for Nucor. We posted record earnings per share, and we shipped a record amount of steel." In this same call, Ferriola noted that, amongst other factors, "[t]he Section 232 steel tabs [sic] provided another tailwind for Nucor." In 2019, CEO Leon Topalian told investors that despite the year's "challenging steel market conditions" that had impacted the earnings of each of its competitors "Nucor generated record operating cash flow of approximately $2.8 billion." The unprecedented earnings continued through 2020, when Nucor investors were told that three of Nucor's product groups "set record[s] for profitability." Finally, in Nucor's most recent earnings call, CEO Leon Topalian cited first-quarter 2021 earnings of $942.4 million, or $3.10 per diluted share—making Q1 2021 "the best quarter in Nucor's history."

## XIV.    Nucor Takes Advantage of JSW's Baytown Postponement, Announcing Its Own Expansion Plan

137.    JSW announced the Baytown expansion project in March 2018. The sheer size of the investment and the industry-shifting nature of the project put Baytown in the headlines of leading industry journals and news outlets. On information and belief, after this announcement was made public and throughout 2018, Nucor, the largest U.S. steel company at the time, led the conspiracy efforts in a series of joint meetings with U.S. Steel and AK Steel to boycott JSW. Only one year after JSW made the Baytown expansion plans public, Nucor made those same headlines

when it announced plans in early April 2019 to build its own strikingly similar state-of-the-art steel plate mill in Brandenburg, Kentucky, and to invest around $1.35 billion to build the mill.  At the time of Nucor's announcement, the boycott against JSW was well underway.  As a result of the boycott, in August 2019 JSW publicly announced that it was delaying its own expansion project at Baytown.

138.    Like JSW, Nucor selected Danieli to supply the EAF melt shop and plate/steckel mills for its new complex at a contract price of $330 million.  Danieli will also supply Nucor with secondary metallurgy equipment, including a twin station ladle metallurgy facility ("LMF") and a twin station vacuum tank degasser ("VTD") that ensure precise chemistries and temperature controls.  The advanced metallurgy equipment will allow Nucor to supply steel products that satisfy more technical specifications.

139.    According to public statements, the Brandenburg plant will be capable of producing 1.2 million net tons per year of cut-to-length, coiled, heat-treated, and discrete plate ranging from 60 to 160 inches wide, and in gauges from 3/16 of an inch to 14 inches in thickness.  Once operational, Nucor's new plate mill will purportedly be capable of producing 97% of plate products demanded in the U.S. market and approximately 20% of the current 6 million-ton global plate market.

## XV.    Defendants Again Certify The Ability and Willingness of U.S. Steel and AK Steel to Supply Slabs to JSW In 2021

140.    Defendants' coordinated statements concerning their ability to supply JSW with domestically manufactured steel slab have been repeated in 2021.

141.    Between March 3 and April 1, 2021, JSW filed 83 additional requests for Section 232 tariff exemptions for slab from Brazil and India.  JSW's requests explicitly detailed how the

company had approached Nucor, AK Steel, and U.S. Steel in 2019 to fill its slab orders but that none of them could supply the slab needed for its operations.

142.    In April 2021, Cleveland-Cliffs, AK Steel's parent company as of March 2020, joined Defendants' conspiracy when it submitted certified statements that it was fully capable of making and supplying domestic steel slab sufficient to meet JSW's requirements based on its newly-acquired manufacturing capabilities at plants in Coatesville, Pennsylvania and Burns Harbor, Indiana.  That month, both Cleveland-Cliffs and U.S. Steel (again) asserted that they each had the ability and capacity to quickly manufacture semi-finished steel slabs in the precise qualities and quantities JSW needed, despite the fact that neither of them had supplied JSW with its requested slab in 2019.  Cleveland-Cliffs certified in these statements that it "has the capability and capacity to produce slabs" of the respective size sought in each of JSW's requests.   On information and belief, Cleveland-Cliffs knew about Defendants' conspiracy because it knew about AK Steel's prior statements regarding its ability and willingness to supply slab to JSW's specifications and that AK Steel had subsequently rejected JSW's business.

143.    U.S. Steel also certified in these 2021 statements that its "steelmaking facilities are capable of producing steel slabs with the requested chemical composition [and] can immediately produce continuously cast slabs that are 8, 8.75, 9.11, or 9.6 inches thick and up to 480 inches long."  Further, U.S. Steel stated that it is "also equipped to produce continuously cast slabs that are 12 inches thick" and that such production "could begin within a matter of weeks."  U.S. Steel repeated these statements in April and May 2021.

144.    For its part, and on information and belief, on the same dates as both AK Steel and U.S. Steel's respective statements, Nucor repeated its assertion that other domestic steel producers (i.e., U.S. Steel and AK Steel) "***are ready and willing to supply the slab required by JSW at***

44

*commercially reasonable prices*."  However, both AK Steel and U.S. Steel have asserted time and again that their "production capacity and plant utilization are proprietary" and not publicly available.  On information and belief, both U.S. Steel and AK Steel's production capacity has remained confidential since their original statements in 2018 and Nucor would have no way of knowing that U.S. Steel and AK Steel would or would not be able to sell slab to JSW absent consultation and coordination with them.

XVI. **U.S. Steel Has Further Attempted to Maintain a Smokescreen Over Its Participation in the Boycott Against JSW by Making Empty Gestures Towards an Interest in Supplying JSW from a Currently Idle Facility**

145.    In April 2021, a representative of U.S. Steel contacted JSW, stating that U.S. Steel was purportedly considering restarting a steel slab caster at one of its mills and asking if JSW would be interested in purchasing slabs from the restarted caster for its Baytown, Texas facility. Further, U.S. Steel again sought JSW's technical specifications for its slab requirements in this April 2021 communication, despite the fact that U.S. Steel has had JSW's technical specifications since at least 2015.

146.    On information and belief, U.S. Steel initiated this communication after reviewing JSW's exemption requests filed in 2021, including JSW's detailed statements regarding its failed efforts to obtain a domestic supply of steel slab from U.S. Steel and the other Defendants in 2019.

147.    On information and belief, U.S. Steel's outreach—offering to supply JSW with slab from a slab caster *that is not currently in operation* and without a timetable for when it could supply JSW, despite specifically representing elsewhere in certified statements that it had steelmaking facilities that could "*immediately produce*" slabs in the chemistry and sizes required by JSW—was nothing more than an empty gesture towards supplying JSW, and was specifically intended to maintain a façade over its continued boycott of JSW.

**JSW HAS SUFFERED ANTITRUST INJURY AND INCURRED SIGNIFICANT DAMAGES AS A RESULT OF DEFENDANTS' GROUP BOYCOTT**

148.    As of the filing of this Complaint, JSW has slowed operations because it cannot buy slabs domestically.

149.    As a result of Defendants' conduct, JSW has suffered numerous forms of antitrust injury and damages, including: (1) payment of approximately $45 million in Section 232 tariffs; (2) exposure to millions of dollars in financial penalties associated with the delay of JSW's Baytown expansion project; and (3) lost profits in excess of ███████ associated with the delay of JSW's Baytown and Mingo Junction expansion projects and artificially reduced production at that both facilities due to Defendants' boycott and refusal to supply JSW with domestic steel slabs. JSW would not have suffered the foregoing damages but for Defendants' conspiracy to boycott JSW.  In addition, because of Defendants' conduct, JSW lost environmental permitting associated with its Baytown expansion project and will have to begin the permitting process again, at substantial cost and with no certainty that such permits will be granted.

150.    The lack of domestic steel slab—JSW's raw material—serves as a chokehold on JSW's operations.

151.    The unlawful conspiracy has had the effect of restraining, suppressing, and eliminating competition in the manufacturing and sale of steel plate, pipe, and coil products in which JSW did and could operate in interstate commerce.

152.    As a direct and proximate result of the illegal combinations, contracts, or conspiracy, which will be established with a reasonable degree of certainty, JSW has been injured and financially damaged in its respective business and property.

153.    Moreover, where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations would be likely to cause.

## COUNT I: VIOLATION OF SHERMAN ACT SECTION 1 AND CLAYTON ACT SECTION 4

154.    JSW hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference as if fully set forth herein.

155.    Beginning in 2018 and until the present, Defendants engaged in a continuing contract, combination, or conspiracy with respect to a naked restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §§ 1 & 15.

156.    The combination and conspiracy consisted of an agreement or agreements among Defendants to engage in a group boycott of JSW.  As described more fully above, Defendants entered into a horizontal agreement to harm JSW by depriving it of its ability to purchase domestic steel slabs, forcing it to reduce production of a range of pipe and steel plate products critical to U.S. infrastructure projects, injuring its financial performance, forcing JSW to pay higher prices for steel slabs by purchasing them from international suppliers subject to tariffs, and leading to the cancellation of its significant expansion plans.

157.    Defendants' agreement is *per se* illegal under Section 1 of the Sherman Act because of its pernicious effect on competition and lack of any redeeming value.  Alternatively, Defendants' agreement is illegal under Section 1 of the Sherman Act because there are no procompetitive benefits to Defendants' conduct that would outweigh its anticompetitive effect.

158.     As a result of Defendants' actions, JSW has suffered antitrust injury by incurring higher costs to purchase steel slabs than it would have in the absence of Defendants' anticompetitive conduct.

**COUNT II:  VIOLATION OF THE TEXAS FREE ENTERPRISE & ANTITRUST ACT**

159.     JSW hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference as if fully set forth herein.

160.     Beginning in 2018 and until the present, Defendants engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code Ann § 15.01 et seq.

161.     The combination and conspiracy consisted of an agreement or agreements among Defendants to engage in a group boycott of JSW.  As described more fully above, Defendants entered into a horizontal agreement to harm JSW by depriving it of its ability to purchase domestic steel slabs, including slabs needed for JSW's manufacture of finished steel products at its manufacturing facility located in Baytown, Texas, and to force JSW to pay higher prices for steel slabs by purchasing them from international suppliers subject to tariffs.

162.     JSW has been injured and will continue to be injured by incurring higher costs to purchase steel slabs than it would have in the absence of Defendants' anticompetitive conduct.

**COUNT III:  CIVIL CONSPIRACY**

163.     JSW hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference as if fully set forth herein.

164.     Defendants conspired to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means in violation of the common law prohibition against civil conspiracy in the State of Texas.  Defendants had a meeting of the minds in their course of action and one or all committed an unlawful, overt act to further the object or their course of action.

165.     Specifically, Defendants conspired with actual malice to violate the federal Sherman Act and Texas Free Enterprise and Antitrust Act by entering into a horizontal agreement to harm JSW by depriving it of its ability to purchase domestic steel slabs, including slabs needed for JSW's manufacture of finished steel products at its manufacturing facility located in Baytown, Texas, and to force JSW to pay higher prices for steel slabs by purchasing them from international suppliers subject to tariffs.

166.     JSW suffered actual damages caused by the conspiracy between Defendants in an amount to be proven at trial.

**COUNT IV:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS**

167.     JSW hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference as if fully set forth herein.

168.     Beginning in 2017, JSW entered into several high-profile contracts with vendors, including but not limited to PTUS, Danieli, Dastur, and Tenova, in preparation for expanding and upgrading its manufacturing facility located in Baytown, Texas.  News of these contracts was widely reported in industry media outlets.

169.     Defendants' violations of federal and state antitrust laws, as described above, have interfered with these existing contractual relationships.  As a result of Defendants' unlawful conduct, JSW has been forced to terminate or delay business undertaken pursuant to these contractual relationships and is exposed to millions of dollars in termination and delay fees to multiple companies associated with these contractual relationships.

170.     Defendants committed the acts described above with actual malice and with the conscious desire to interfere with these relationships, or Defendants at least were certain or substantially certain that such interference would result from their conduct.  JSW's planned

expansion of its Baytown manufacturing facility, as well as its contracts with vendors undertaken in connection with the expansion, were a matter of public knowledge at the time that Defendants entered into their illegal group boycott.  Defendants were aware of these contracts and acted with knowledge that their conduct would directly interfere with the execution of such contracts.

171.     JSW has suffered actual damages as a result of Defendants' interference.

## COUNT V:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS

172.     JSW hereby restates and re-alleges the allegations set forth in the preceding paragraphs and incorporates them by reference as if fully set forth herein.

173.     There is a reasonable probability that JSW would have entered into new, or expanded upon existing, business relationships with customers, including private customers as well as state and federal governments in connection with defense, energy, and infrastructure projects, for the purchase of finished steel products that JSW would have been able to manufacture at its Baytown, Texas facility following JSW's planned expansion and upgrade projects.  For example, JSW was in discussions with numerous companies and was well-positioned, following completion of the Baytown expansion project, to provide such products to those companies as: (1) heavy plate for large wind towers; (2) as much as 30,000 tons per month of shell plate for tank rail cars; (3) heavy plate for infrastructure projects such as bridges; and (4) heavy plate for commercial ship building.

174.     Defendants' unlawful conduct, as described above, has prevented those business relationships from expanding or occurring.

175.     Defendants committed the acts described above with actual malice and with the conscious desire to prevent the occurrence or expansion of those relationships, or Defendants at

least were certain or substantially certain that such prevention of the occurrence or expansion of those relationships would result from their conduct.

176.     JSW suffered actual harm as a result of Defendants' interference.

## ATTORNEYS' FEES AND COSTS

177.     JSW is entitled to an award of attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## JURY REQUEST

178.     Pursuant to the U.S. Const. amend. 7, Federal Rule of Civil Procedure 38, and Local Rule 38.1, JSW hereby demands a trial by jury on all issues of fact.

## PRAYER FOR RELIEF

179.     JSW respectfully prays as follows:

a.   That the contracts, combinations, or conspiracy, and the acts done in furtherance of that conspiracy by Defendants, be adjudged to have been *per se* violations, or alternatively, violations under the Rule of Reason, of Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.   That the contracts, combinations, or conspiracy, and the acts done in furtherance of that conspiracy by Defendants, be adjudged to have been violations of the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code Ann § 15.01 et seq.;

c.   That Defendants' unlawful conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code Ann § 15.01 et seq., be adjudged to have been a Civil Conspiracy in violation of the common law of the State of Texas;

d.  That Defendants' unlawful conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code Ann § 15.01 et seq., be adjudged to have been Tortious Interference with Existing Contracts in violation of the common law of the State of Texas;

e.  That Defendants' unlawful conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code Ann § 15.01 et seq., be adjudged to have been Tortious Interference with Prospective Business Relationships in violation of the common law of the State of Texas;

f.  That judgment be entered for JSW against Defendants under each of the Sherman Act Section 1, Clayton Act Section 4, and the Texas Free Enterprise and Antitrust Act for three times the amount of actual damages sustained;

g.  That all Defendants shall be held jointly and severally liable for all damages, costs, and attorneys' fees assessed against them

h.  That JSW recover special and exemplary damages;

i.  That JSW recover from Defendants all costs of Court and attorneys' fees;

j.  That JSW be awarded pre- and post-judgment interest at the highest legal rate; and

k.  That JSW receive such other relief as the Court may deem just and proper under law or equity.

Dated: June 8, 2021

Respectfully submitted,

**BAKER BOTTS L.L.P.**

/s/  Joseph A. Ostoyich

Joseph A. Ostoyich (*pro hac vice* to be filed)
(attorney-in-charge)
(joseph.ostoyich@bakerbotts.com)

Michael L. Calhoon (Texas State Bar
No:00785744; Southern District of Texas No.
16474) (michael.calhoon@bakerbotts.com)

Julie B. Rubenstein (*pro hac vice* to be filed)
(julie.rubenstein@bakerbotts.com)

Christopher Wilson (*pro hac vice* to be filed)
(christopher.wilson@bakerbotts.com)

JoAnna Adkisson (*pro hac vice* to be filed)
(joanna.adkisson@bakerbotts.com)

700 K St. NW
Washington, D.C. 20001
P: 202.639.7700
F: 202.639.7890

*ATTORNEYS FOR PLAINTIFFS JSW STEEL
(USA) INC. and JSW STEEL USA OHIO, INC.*