United States District Court
Southern District of Texas
**ENTERED**
February 17, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JSW STEEL (USA) INC.,** *et al.***,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:21-CV-01842** |
| | § | |
| **NUCOR CORP.,** *et al.***,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM & ORDER</u>

On January 27, 2022, the Court held a hearing on Defendants' Motions to Dismiss. Docs. 46, 47. The Court took the motions under advisement and allowed the parties to file supplemental briefing if desired. Plaintiff filed a supplemental memorandum. Doc. 83. Having considered the parties' briefing and oral arguments, the Court now **GRANTS** the Motions to Dismiss for the reasons set forth below.

## I.    BACKGROUND

### A.  Alleged Facts

#### 1.  *JSW*

Plaintiffs JSW Steel (USA) Inc. and JSW Steel USA Ohio, Inc. (collectively, "JSW") brought this lawsuit. JSW is a small U.S. manufacturer of finished steel products that owns and operates facilities in Baytown, Texas, and Mingo Junction, Ohio. Compl. ¶ 2. It is part of a steel conglomerate based in India.

This case involves domestically manufactured steel slab—the critical feedstock that JSW and other manufacturers use in the production of their finished products. *Id.* ¶ 44, 53. JSW has

certain chemical and metallurgical requirements for the slab it purchases and uses to make high-quality finished steel pipe, plate, and coil products. *Id.* ¶¶ 2, 43. JSW sells the pipe, plate, and coil products for use in critical infrastructure projects, such as natural gas and oil transmission pipelines, shipbuilding, transmission pole towers, wind towers, railroad tank cars, and other heavy equipment industries in the United States. *Id.*

From 2015 until early 2019, JSW enjoyed steadily increasing sales. *Id.* ¶ 60. As a result of this growth, in early 2018, JSW announced and began implementing two significant expansion projects in Baytown and Mingo Junction. <u>First</u>, JSW publicly announced a $500 million investment project at its Baytown facility to build the most technologically advanced and eco-friendly electric arc furnace ("EAF"), slab caster, and plate mill in the world. *Id.* ¶ 55–59, 61, 78. The project was designed to transform JSW's Baytown facility into the only melt and manufacture ("M&M") plate mill in the United States with a contiguous pipe mill capable of supplying large diameter welded steel pipe for oil and gas transmission. *Id.* ¶ 61. JSW broke ground on this project in Fall 2018; it had entered into construction and supply contracts and obtained a New Source Review Air Permit from the U.S. Environmental Protection Agency. *Id.* ¶ 62.

<u>Second</u>, JSW announced plans and took steps to ramp up and modernize its Mingo Junction, Ohio, facility, to make hot-rolled coil bands. *Id.* ¶¶ 66, 77. JSW expected significant revenue growth from these projects. *Id.* ¶ 75.

### 2. *Defendants*

Defendant Nucor is a Delaware corporation with its principal place of business in North Carolina. It is a leading domestic producer of sheet steel, plate steel, structural steel, bar steel, and steel coils. It operates five sheet mills that produce flat-rolled steel for automotive, appliance, construction, pipe and tube, and other industrial and consumer applications. *Id.* ¶ 34. Nucor

currently maintains about 31% market share of domestic steelmaking capacity, making it the second largest manufacturer in the U.S. *Id.* ¶ 49.

Defendant U.S. Steel is a Delaware corporation with its principal place of business in Pennsylvania. It is a fully integrated steel producer with operations in the U.S., Canada, and Europe, where it manufactures semi-finished steel slab that it uses to produce finished steel products, including sheet steel, steel plate, and steel coils. *Id.* ¶ 35. It is the third largest steel producer in the U.S. and maintains about 19% market share of domestic steelmaking capacity. *Id.* ¶ 51.

Defendant AK Steel is a Delaware corporation with its principal place of business in Ohio. It is an integrated producer of flat-rolled carbon, stainless, and electrical steel products, primarily for the automotive, infrastructure and manufacturing, and distributor and converter markets. Around March 13, 2020, AK Steel was acquired by Cleveland-Cliffs Inc. It became a direct, wholly owned subsidiary of Cleveland-Cliffs, operating under the name AK Steel Holding Corporation. *Id.* ¶ 36.

Defendant Cleveland-Cliffs is an Ohio corporation with its principal place of business in Ohio. Cleveland-Cliffs is a fully integrated producer of custom-made iron ore pellets; flat-rolled carbon, stainless, electrical, plate, tinplate and long steel products; and carbon and stainless-steel tubing. *Id.* ¶ 37. With the acquisitions of AK Steel and ArcelorMittal (a major producer not named in this lawsuit and not alleged to have joined in any conspiracy), Cleveland-Cliffs holds approximately 34% market share of domestic steelmaking capacity, making it the largest steel producer in the United States. *Id.* ¶ 52.

Defendants U.S. Steel, AK Steel, and Cleveland-Cliffs are purportedly domestic manufacturers of steel slab in the size and chemistry that is the feedstock for JSW end products.

Nucor is also a domestic manufacturer of slab, though Nucor uses that slab as part of its continuous manufacturing process and cannot offload any to customers like JSW. *Id.* ¶ 37.

### 3.   U.S. Steel Tariff Program and Meetings Involving Defendants

JSW does not itself produce steel slab; rather, it must buy slab from other producers to make its finished products. *Id.* ¶ 3. Historically, JSW has imported steel slabs from India, Mexico, and Brazil to support its U.S. operations. *Id.* ¶¶ 81, 94. Tariffs could challenge JSW's ability to benefit from imported slab.

In April 2017, the U.S. Department of Commerce ("Commerce") began investigating the effects of steel imports on U.S. national security pursuant to Section 232 of the Trade Expansion Act, 19 U.S.C. § 1862. U.S. Dep't of Commerce, *Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel*, at 1 (Apr. 21, 2017). The investigation concluded that a robust American steel industry is an essential component both of domestic economic viability and national security. U.S. Dep't of Commerce, *The Effect of Imports of Steel on the National Security*, at 1-2, 13, 23 (Jan 11, 2018) (appendix omitted).[1] The Commerce Department further determined that the importation of cheap foreign steel "adversely impact[s] the economic welfare of the [U.S. steel] industry." *Id.* at 27.

Accordingly, on March 1, 2018, then-President Trump announced that the U.S. would impose a 25% tariff on most steel imports. Compl. ¶ 79; *see also* 15 C.F.R. Pt. 705, Supp. 1. "Most of the domestic steel industry"—including JSW—professed "uniform support of the tariffs." Compl. ¶ 83.

---

[1] The Court can "take judicial notice of agency records and reports" such as the Commerce Report, which appears in the Federal Register. *See Terrebonne v. Blackburn*, 646 F.2d 997, 1000 (5th Cir. 1981). Plaintiffs presented no opposition to Defendants' arguments on judicial notice.

Around this time, Defendants (and other domestic steel producers) met with the President, *id.* ¶ 81, the House of Representatives, *id.* ¶¶ 83, 88, and officials in the Department of Commerce, *id.* ¶¶ 90, 91. Plaintiffs suggest that these meetings were at least partly for the purpose of organizing the alleged conspiracy, while Defendants maintain that these meetings were solely to discuss advocacy efforts related to the tariff. For example, on September 6, 2018, representatives from Nucor and U.S. Steel met after Nucor's representative stated: "We spoke with Nazak Nikakhtar [Department of Commerce] a few weeks ago about possible changes to the steel Section 232 exclusion process. Last Friday she suggested that we also meet with Earl [likely Earl Comstock, Department of Commerce] to discuss this issue. **Ideally, the meeting would be with both Nucor and U.S. Steel because both companies have been working together.**" Compl. ¶ 91 (emphasis in original). There is a factual dispute whether the companies were "working together" on issues beyond the tariff on imported steel. On Plaintiffs' information and belief, Defendants have also participated in trade association meetings from 2018 to the present. *Id.* ¶ 92.

As part of the tariff program, the Department of Commerce created a process to exclude from the tariffs any steel product that "could not be sourced domestically." *Id.* ¶ 82. Under this process, an exclusion request may be granted if the Department of Commerce's Bureau of Industry and Security ("BIS") determines that the product to be imported is not domestically available in sufficient quantity and quality. 15 C.F.R. Pt. 705, Supp. 1 (c)(6).

Domestic steel producers can object to a tariff exclusion request if they can demonstrate that the product to be imported is available domestically. *Id.* ¶ 82; *see also* 15 C.F.R. Pt. 705, Supp. 1 (d)(4). These regulations do not require objectors to demonstrate that the steel product available domestically "be identical," but only that it "be equivalent as a substitute product." 15 C.F.R. Pt. 705, Supp. 1 ¶ (c)(6)(ii). Objections to an exclusion request must be submitted within a 30-day

public comment period. *Id.* at ¶ (d)(3). From there, both the importer and objector(s) are afforded

a final opportunity to respond through a rebuttal process. *Id.* at ¶¶ (f)(4), (g)(4). Then, BIS alone

determines whether to grant or deny the request. *Id.* at ¶ (c)(6).

If an exclusion request is denied, but it later comes to light that the product was not, in fact,

available domestically, then the importer may submit a new exclusion request that refers to the

original request. *Id.* at ¶¶ (c)(6)(i), (ii).

Congress has vested "exclusive jurisdiction" in the U.S. Court of International Trade to

hear challenges to "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons

other than the raising of revenue," including the Section 232 tariffs and denials of exclusion

requests. 28 U.S.C. § 1581(i)(1)(B); *see Commodities Exp. Co. v. U.S. Customs Serv.*, 957 F.2d

223, 227 (6th Cir. 1992) ("Congress invested the CIT with exclusive jurisdiction over a wide range

of trade matters encompassing complex regulatory schemes in order to allocate power between the

CIT and the district courts"). The CIT and Federal Circuit, which hears appeals from the CIT, have

upheld Government actions under Section 232 against various challenges. *See American Inst. for

Int'l Steel, Inc. v. United States*, 806 F. Appx. 982 (Fed. Cir. 2020) (rejecting constitutional

challenge to Section 232 tariffs); *Transpacific Steel LLC v. United States*, 2021 WL 2932512, at

*1333 (Fed. Cir. July 13, 2021) (rejecting challenge to temporary increased tariff on steel from

Turkey).

### 4.   *JSW's 2018 Tariff Exclusion Requests*

JSW alleges that, "due to quotas and other limitations on quantity, and to significant tariffs

imposed beginning in 2018, imports were not available in the quantity JSW requested." *Id.* ¶ 3.

"Anticipat[ing] that it would need a temporary tariff exemption," in the spring of 2018 JSW filed

exclusion requests for imported slab under the Commerce regulations described above. *Id.* ¶ 93. Domestic steel companies thus had 30 days to object. 15 C.F.R. Pt. 705, Supp. 1 § (d)(3).

Nucor, a U.S.-based steel producer, filed objections to JSW's requests for exclusions from the national security tariffs on May 31, 2018, and again on August 30, 2018. Compl. ¶¶ 90, 99, 100; Doc. 45, Exh. B-C.[2] While Nucor makes slab at its steel mills, Nucor consumes that slab internally in its production of finished steel products; as mentioned above, JSW alleges that Nucor does not "offload [its slab] to customers like JSW." Compl. ¶ 38. Although Nucor's objections did not represent that Nucor itself could supply JSW with domestically produced slab, Nucor cited publicly available data[3] to support its position that "adequate supplies of slab . . . are readily available from both domestic sources and from countries exempted from the Section 232 tariffs." Doc. 45, Exh. B, at 1; Doc. 45, Exh. C, at 1.

JSW alleges that U.S. Steel and AK Steel also filed objections to JSW's slab exclusion requests on roughly the same 30-day timetable set by the Commerce regulations. Compl. ¶¶ 93-98.[4] JSW alleges that—unlike Nucor—U.S. Steel and AK Steel asserted in their objections that they themselves could, and would be willing to, supply JSW's slab needs. *Id.* ¶¶ 93-98

In response, JSW submitted rebuttals arguing that AK Steel and U.S. Steel could not produce slabs to the technical specifications or dimensions that JSW requested. Nucor and U.S. Steel then filed sur-rebuttals pointing out domestic availability of the specified slabs, including

---

[2] The Court can consider JSW's exclusion requests and Defendants' related filings because they are "referred to in the plaintiff's complaint and ware central to [its] claim[s]." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quotation omitted). Plaintiffs presented no opposition to Defendants' arguments on judicial notice.

[3] In support of its objection, Nucor cited: (1) JSW's own exclusion request writing; (2) trade association data; (3) public information that various manufacturers, including U.S. Steel and ArcelorMittal, had idled or under-utilized facilities that could make slab; and (4) a U.S. Transportation Department determination of "adequate capacity for the U.S. steel industry to meet a demand for semi-finished steel slab if the market price is adequate." Doc. 45, Exh. B, at 1-3; *id.*, Exh. C, at 2-3.

[4] JSW alleges that AK Steel filed on May 29, 2018, two days before the deadline (when U.S. Steel filed). Compl. ¶ 94.

acceptable substitute products. *See*, *e.g.*, Doc. 46, Exh. H, *[U.S. Steel's] Sur-rebuttal and Supplement to Objection Filed Against Excl. Req. 1227* (clarifying that JSW's exclusion requests were not for 12" slab, but for the range of 275 mm to 310 mm, which U.S. Steel could supply). AK Steel did not submit a sur-rebuttal.

In April and May 2019, after considering the full record of information submitted both by JSW and by Defendants, BIS formally denied each of JSW's 12 exclusion requests in separate decision memoranda. *See*, *e.g.*, Doc. 46, Exh. I, *BIS Decision Document—Excl. Req. 1227*. For each request, BIS concluded that the requested steel slab "[wa]s produced in the United States in a sufficient and reasonably available amount and of a satisfactory quality" and "that no overriding national security concerns require[d] that th[e] exclusion request be granted." *Id.*; *see* Compl. ¶ 107.

### 5. JSW's "Firm Inquiries" to Purchase Domestic Slab

After JSW's exclusion requests were denied, JSW contacted AK Steel and U.S. Steel in May 2019 with "firm inquiries" to purchase steel slab. Compl. ¶ 107. On May 8, 2019, JSW sent AK Steel a firm inquiry for a large purchase of 30,000 tons of 10- to 12-inch-thick continuous cast carbon slab. *Id.* ¶¶ 110–111, 115. Upon receiving JSW's inquiry, AK Steel requested that JSW establish its creditworthiness by providing either financial statements or a standby letter of credit written on a U.S. bank. *Id.* ¶¶ 111–112. JSW refused, offering instead to supply a documentary letter of credit. *Id.* AK Steel nonetheless reviewed JSW's proposal and provided preliminary feedback to JSW, offering to sell it the slab subject to JSW's acceptance of certain technical exceptions and a credit check. JSW ended the discussions based on its allegation that "the exception sheet ran contrary to AK Steel's certified statements that it 'has the ability to produce' the projects subject to JSW's exemption requests—including to the sizes and exacting chemistries

that JSW required." *Id.* ¶¶ 113–114. JSW alleges that AK Steel rendered any transaction impossible by erecting pretextual creditworthiness requirements and seeking significant deviations from JSW's requested chemistries and sizes; JSW maintains, on information and belief, that this conduct constituted a refusal to deal based on a conspiracy. *Id.* ¶¶ 116.

JSW's interactions with U.S. Steel followed a similar pattern. On May 8, 2019—the same day JSW initially contacted AK Steel—JSW also sent U.S. Steel a firm inquiry to purchase nearly 30,000 tons of 10-12 inch thick continuously cast carbon steel slab. *Id.* ¶ 115. Robert Oster from U.S. Steel informed JSW that it would need to provide evidence of JSW's creditworthiness. *Id.* ¶ 116. The same day, U.S. Steel credit department sent JSW a list of the information it needed to complete the credit check. *Id.* JSW never provided the information, nor does it allege that it attempted to comply with the request. *Id.* U.S. Steel nonetheless reviewed the technical specifications that JSW requested. *Id.* ¶ 117. U.S. Steel told JSW that it could produce the steel slab that JSW wanted with a few technical "deviations" after JSW produced evidence of its creditworthiness. *Id.* JSW does not allege that it responded to U.S. Steel's proposal. *Id.*

In April 2021, U.S. Steel reached back out to JSW to explain that U.S. Steel planned to start an EAF and steel slab caster at its Fairfield, Alabama, facility. *Id.* at ¶ 145; Doc. 46 at 15. U.S. Steel inquired whether it could source steel for JSW from that new facility. *Id.* JSW does not allege that it responded to this offer. *Id.*

### 6.   *JSW's Appeal of Commerce's Decisions on Its 2018 Exclusion Requests*

On July 30, 2019, JSW filed a complaint in the Court of International Trade challenging BIS's denial of its 2018 exclusion requests. Compl., July 30, 2019, ECF No. 2, *JSW Steel (USA)*

*Inc. v. United States*, No. 1:19-00133, slip op. 20-111 (Ct. Int'l Trade Aug. 5, 2020).[5] JSW argued that the denials were "arbitrary, capricious, and an abuse of discretion"; it alleged that BIS "undertook no efforts to verify [Defendants' objections]" and "ignored the conclusive evidence that these companies [were] unable to produce the subject products in the required quantity or quality." *Id.* ¶ 8. The Court of International Trade remanded the decisions to BIS for reconsideration. *JSW Steel*, No. 1:19-00133, slip op. 20-111 at 2-3.

On September 21, 2020, JSW and the Commerce Department resolved the dispute through a stipulated judgment. Stip. J., Sept. 18, 2020, ECF No. 103, *JSW Steel (USA) Inc.*, No. 1:19-00133. Among other provisions, Commerce refunded an undisclosed amount of the tariffs paid by JSW "as a full and complete settlement of all claims subject to this action." *Id.* ¶¶ 6–7.

### 7. *The Parties' Financial Performance*

JSW alleges that its upward financial trajectory came to a halt because of Defendants' boycott. *Id.* ¶ 119. Its slab acquisition and overall manufacturing costs increased dramatically, as it was forced to slow its production and pay more for imported slab. *Id.* JSW Baytown's sales revenue dropped by over 25%—over $100 million—in the fiscal year ending in March 2020 compared to the prior year. The following fiscal year, Baytown's overall sales revenue fell by over 65% compared to 2019. *Id.* ¶ 121. The company stopped its Baytown expansion project, terminating contracts into which it had already entered, resulting in termination fees of $20 million. *Id.* ¶ 125.

Meanwhile, Defendants have recently enjoyed strong financial performance:

---

[5] The Court "may take judicial notice of a 'document filed in another court . . . to establish the fact of such litigation and related filings.'" *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) (citation omitted). Plaintiffs presented no opposition to Defendants' arguments on judicial notice.

- Nucor reported "record earnings" in 2018 and "record operating cash flow of approximately $2.8 billion" in 2019. *Id.* ¶ 136. In 2020, Nucor reported that it "set record[s] for profitability." *Id.* For the first quarter of 2021, the company reported its "best quarter in Nucor's history." *Id.* It had announced a plan to build its own state-of-the-art steel plate mill, which JSW alleges is strikingly similar to the mill JSW had to abandon. *Id. ¶ 137.*

- In 2018, AK Steel reported having the company's "best year in a decade." *Id.* ¶ 133. Following its acquisition of AK Steel and ArcelorMittal USA, Cleveland-Cliffs reported earnings up 158% from the previous year. *Id.* ¶ 134.

- In the first quarter of 2021, Cleveland-Cliffs announced profits of $513 million, representing a 79% increase over the previous quarter, while projecting a nearly 200% rise in profit to $1.2 billion in the second quarter of 2021. *Id.*

- U.S. Steel reported its "strongest performance since 2008" for fiscal year ending December 31, 2018. *Id.* ¶ 135.

### 8.  *JSW's 2021 Tariff Exclusion Requests*

JSW filed 83 additional exclusion requests in March and April 2021, this time for steel slab imported from Brazil and India. Compl. ¶ 141. JSW claimed in its new requests that it had been unsuccessful in purchasing steel slab from AK Steel and U.S. Steel in 2019. *Id.*

U.S. Steel, Nucor, and now Cleveland-Cliffs objected to JSW's new exclusion requests. *Id.* ¶¶ 142-143. BIS has granted all 83 exclusion requests over Defendants' objections. *See* U.S. Dep't of Commerce Website, Section 232 Steel and Aluminum, Published Exclusion Requests filtered to JSW Steel (USA) Inc., https://232app.azurewebsites.net/ (status "Granted" for each of JSW's 83 exclusion requests). BIS's decision memoranda included an analysis conducted by a Commerce Department subject matter expert, who determined that both Cliffs and U.S. Steel

produce slabs of sufficient weight and with sufficient chemical and dimensional properties for JSW's needs. *See*, *e.g.*, Doc. 46, Exh. J, BIS Decision Document—Excl. Req. 89352. Nevertheless, the exclusions were granted on the basis that Cleveland-Cliffs and U.S. Steel did not address a standard cited in JSW's request. *Id.*

### B.  Procedural History

JSW filed this Complaint on June 8, 2021, alleging that Defendants (1) violated Sherman Act § 1 and Clayton Act § 4; (2) violated the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code Ann § 15.01 *et seq.*; (3) engaged in civil conspiracy in violation of Texas state law; (4) tortiously interfered with existing contracts; and (5) tortiously interfered with prospective business relationships.

The now-pending motions to dismiss (one filed Nucor, another filed by the remaining Defendants) were filed on August 17, 2021.

Amid briefing on the motions to dismiss, Defendants filed a Motion to Stay Discovery Pending the Motions to Dismiss; the Court granted this motion on December 7, 2021.

The Court held a hearing on the motions to dismiss on January 27, 2022. Plaintiff subsequently filed supplemental briefing.

## II.  MOTIONS TO DISMISS

### a.  Legal Standards

#### 1.  MTD

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). When faced with two possible explanations for a defendant's conduct, only one of which results in liability, a plaintiff cannot offer allegations that are "merely

consistent with" their favored explanation but are also consistent with the alternative explanation. *Twombly*, 550 U.S. at 557. "[S]omething more" is needed. *Id.* at 560. The plaintiff must plead facts excluding the possibility that the "obvious alternative explanation" is true, *id*. at 567, which requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### 2. *Sherman Act § 1 Claims Based on Alleged Parallel Conduct*

A complaint alleging a conspiracy in violation of Section 1 of the Sherman Act must allege that Defendants (1) engaged in a conspiracy, (2) that restrained trade, (3) in the relevant market. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002). JSW must allege an agreement between two or more persons, since "unilateral conduct is excluded from [the Sherman Act's] purview." *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996). A "conclusory allegation of agreement at some unidentified point" is not sufficient to survive a motion to dismiss. *Twombly*, 550 U.S. at 557.

Moreover, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. Instead, a plaintiff must plead factual allegations sufficient for the Court to draw a reasonable inference that Defendants made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 373-74 (5th Cir. 2014) (quotation omitted); *see also Abraham & Veneklasen v. Am. Quarter Horse Ass'n ("A&V")*, 776 F.3d 321, 330 (5th Cir. 2015) (agreement requires a "common design and understanding, or a meeting of the minds in an unlawful arrangement") (citation omitted).

Moreover, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "Any conduct that is as consistent with permissible competition as with illegal

conspiracy does not, standing alone, support an inference of antitrust conspiracy." *A&V*, 776

F.3d at 331 (citation omitted). And an "inference of a conspiracy is always unreasonable when it

is based solely on parallel behavior that can be explained as the result of the <u>independent</u>

<u>business judgment</u> of the defendants." *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d

485, 494 (5th Cir. 1982) (emphasis added).

Because JSW's § 1 claim relies on alleged parallel conduct, JSW must plead so-called

"plus factors" that are indicative of conspiracy. *In re Pool Products Distrib. Market Antitrust

Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (citing cases). While there is no exhaustive or

finite list of plus factors, some recognized plus factors include: actions that would be against the

defendants' self-interest if the defendants were acting independently, but consistent with their

self-interest if they were acting in concert; a motive to conspire; opportunities to conspire;

market concentration and structure conducive to collusion; pretextual explanations for

anticompetitive conduct; sharing of pricing information; signaling among competitors; and other

traditional facts suggestive of conspiracy. *Id.*, 988 F. Supp. 2d at 711. Plausible factual

allegations that tend to demonstrate "that the parallel conduct was not in the alleged conspirators'

independent self-interest absent an agreement is generally considered the most important 'plus

factor.'" *Id.* (citations omitted).

### b.  Nucor's Motion to Dismiss

Nucor argues that: (1) JSW fails to allege that Nucor entered into an agreement

restraining trade; (2) JSW's claims are barred by the *Noerr-Pennington* doctrine (described

below); (3) JSW does not allege an antitrust injury; and (4) the state law claims should be

dismissed for lack of personal jurisdiction and failure to state viable claims for relief.

### 1.   *Whether Nucor plausibly entered into an agreement restraining trade*

Nucor argues that Plaintiff's Sherman Act § 1 claim must fail because there is no "agreement" between multiple parties. Nucor asserts that JSW fails to allege any actual conduct or inaction by Nucor that could support an inference of an illegal agreement. The only allegations about Nucor's conduct relate to its petitioning activities in support of the Section 232 national security tariffs and against unfounded exclusion requests. JSW never alleges that it reached out to Nucor to inquire about purchasing of domestic slab; rather, it admits that Nucor's operations are not set up to "offload [slab] to customers like JSW." Compl. ¶ 38.

In opposition, JSW points to its allegation that Nucor was receiving confidential information from the other Defendants, which it could only have done if they were illegally conspiring. *Id.* ¶ 102 ("Upon information and belief, given the proprietary nature of AK Steel and U.S. Steel's product, pricing, and production capabilities, Nucor would have no way of knowing at what prices and in what quantities U.S. Steel and AK Steel would or would not have been able to sell slab to JSW absent consultation and/or coordination with them."). The Court agrees with Nucor's assertion that JSW mischaracterizes its objection, which was based on public, rather than proprietary, information about the collective capabilities of the domestic industry in the aggregate (*see* Sec. I(A)).

JSW also notes the closeness in time between Nucor's objection submissions and those of U.S. Steel and AK Steel. *Id.* ¶¶ 93 ("***simultaneously proclaimed***"), 95 ("***two days later***"; "simultaneous August 30, 2018 statements by U.S. Steel and Nucor"), 99 ("on the same day"), 103 ("***within the span of two days***"; "on the ***exact same day***") (all emphases in original). The Court finds this argument similarly unavailing. The Commerce regulations governing the

adjudication of exclusion requests imposed a 30-day deadline on such objections. 15 C.F.R. Pt. 705, Supp. 1 § (d)(3). It is unremarkable that all objectors filed on or around the deadline.

Nucor also attacks JSW's suggestion that trade association meetings attended by Defendants' executives over a two-year period presented an opportunity to conspire. However, common attendance at trade association meetings is insufficient to infer a conspiracy. *See*, *e.g.*, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-11 (6th Cir. 2009); *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 541-42 (N.D. Tex. 2014). It is not sufficient to allege simply that some defendants may have "conversed with other defendants"; there must be "factual support that those conversations were for the intent and purpose of reaching an agreement to unreasonably restrain trade." *Haygood v. Begue*, 2016 WL 1069685, at *6 (W.D. La. Mar. 16, 2016). Nucor argues that JSW fails to provide such factual support.

The Court concludes that JSW has failed plausibly to allege that Nucor entered into a conspiratorial agreement in violation of Sherman Act § 1. JSW fails to offer factual allegations that would reasonably substantiate an inference of conspiracy. For this reason alone, the Court must dismiss the Sherman Act claim. Nonetheless, the Court continues to Nucor's arguments regarding the *Noerr-Pennington* doctrine and antitrust injury, which provide additional and alternative grounds for dismissal of the Sherman Act claim against Nucor.

### 2. Whether JSW's claims are barred by the Noerr-Pennington *doctrine*

Nucor argues that, to the extent JSW alleges parallel conduct by Nucor at all, it alleges parallel *petitioning* conduct that is protected by the *Noerr-Pennington* doctrine. Because the First Amendment protects the ability of citizens, including businesses, to petition the government, "[j]oint efforts to influence public officials do not violate the antitrust laws, even though

intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965); *see also E.R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *accord Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861 (5th Cir. 2000); *Video Int'l Prod., Inc. v. Warner-Amex Cable Comm'cns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358 (5th Cir. 1983). Courts routinely dismiss antitrust complaints seeking to impose liability for conduct covered by *Noerr-Pennington*. *See*, *e.g.*, *Tricon Precast, Ltd. v. Easi Set Indus., Inc.*, 395 F. Supp. 3d 871, 884 (S.D. Tex. 2019); *id.* at 884 n.2 (collecting cases).

As discussed above, the only conduct by Nucor alleged in the Complaint involves (a) Nucor's public advocacy relating to the Section 232 national security tariffs, and (b) objections Nucor filed with Commerce to oppose JSW's exclusion requests. JSW repeatedly emphasizes an email mentioning Nucor and U.S. Steel "***working together***," which JSW calls an "admission" making Nucor the "ringleader" of the conspiracy. Compl. ¶ 5 (emphasis in original), Heading VII (p. 27), 86, 91. However, a more reasonable reading of the full quotation indicates that what Nucor and U.S. Steel were "working together" on was advocacy to Commerce about "possible changes to the steel Section 232 process." Compl. ¶ 91; Doc. 45, Exh. A.[6] The email's purpose was to schedule a meeting between Commerce, Nucor, and U.S. Steel to discuss those changes. Doc. 45, Exh. A. Nucor argues that this is classic *Noerr-Pennington* conduct.

Nucor asserts that the doctrine similarly applies to the White House "face-to-face meeting and press conference with then-President Trump," Compl. ¶ 87; CEOs' joint appearances "before

---

[6] The Court can go outside the four corners of the Complaint to consider the email exchange because it is "referred to in the plaintiff's complaint and [is] central to [its] claim[s]." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quotation omitted).

the Congressional Steel Caucus," *id.* ¶ 88; and the exclusion objection filings, *id.* ¶¶ 85, 93-106,

140-44. Joint efforts by competitors to influence government decision-makers are protected by

the *Noerr-Pennington* doctrine and cannot be a basis for liability.

In its Response, JSW counters that *Noerr-Pennington* does not apply under these

circumstances. According to JSW, it alleged an illegal conspiracy to boycott JSW and refuse to

sell it <u>domestic</u> slab. JSW emphasizes that the Complaint does not allege that Defendants lobbied

Congress or petitioned the Commerce Department for any government decision regarding

domestic slab.

The Court, however, finds that JSW's (seemingly revised) position appears irreconcilable

with the fact that the only conduct by Nucor alleged in the Complaint involves Nucor's

petitioning activities. *See*, *e.g.*, *id.* ¶¶ 87 (alleging Nucor CEO attended White House meeting in

support of tariffs), 88 (alleging Nucor CEO gave congressional testimony supporting tariffs), 91

(referencing email about setting up joint industry meeting with Commerce to discuss changes to

the Section 232 exclusion process).

The Court further finds that, under these circumstances, the topics of foreign steel and

domestic steel are inextricably interwoven. The tariffs' purpose was to stem the national security

threat posed by unfairly traded imports to domestic steel production. Procl. of Mar. 8, 2018, 83

Fed. Reg. 11625 (Mar. 15, 2018). And the touchstone for exclusion requests is whether the

product is "produced in the United States in a sufficient and reasonably available amount" and

"satisfactory quality." 15 C.F.R. pt. 705, Supp. 1 § (c)(5). With respect to Nucor, JSW focuses

on Nucor's statements about domestic availability of domestic slab, as made in a slab exclusion

objection addressed to Commerce. Compl. ¶¶ 94, 95, 99, 100, 102. Thus, JSW's attempt to avoid

*Noerr-Pennington* by characterizing Nucor's petitioning of the Government as unrelated to domestic slab is unconvincing.

JSW's other argument—that it is premature at the MTD stage for the court to consider the applicability of *Noerr-Pennington*—is similarly unavailing. In the cases cited by JSW, the plaintiffs invoked the "sham" exception to *Noerr-Pennington*, creating fact-bound issues. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993) (outlining narrow "sham" exception). In this case, by contrast, JSW does not invoke the sham exception. *See* Doc. 45, at 19 n.12 (pointing out lack of sham allegations); Doc. 51, at 28-29 (no sham argument in JSW's opposition). Nor could it. Nucor's petitioning was successful, and "successful effort[s] to influence governmental action . . . cannot be characterized as a sham." *Tricon*, 395 F. Supp. 3d at 885-86 (quotation marks omitted); *Bayou Fleet*, 234 F.3d at 862.

Accordingly, the Court concludes that the Sherman Act claim should be dismissed based additionally and independently on the Noerr-Pennington doctrine.

### 3. *Whether JSW alleges a cognizable antitrust injury*

To state an antitrust claim, a plaintiff must plead antitrust standing, which requires establishing "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015). To satisfy antitrust standing, a plaintiff's injury must be proximately caused by the defendants' conduct. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). But when the plaintiff's damages are the result of a superseding cause, such as government action or the plaintiff's own decisions, that causal chain is broken, and the plaintiff

does not have an actionable claim. *See* 1 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2.02[C] at 166 (4th ed. 2018).

Nucor argues that JSW's alleged injuries stem fundamentally from the U.S. Government's national security tariffs and its (initial) refusal to exempt JSW from those tariffs— not from any antitrust violation. To help illustrate why dismissal is appropriate under these circumstances, Nucor—like the other Defendants—cites *In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 791 (8th Cir. 2006), where individuals who wanted to import cheaper prescription drugs from Canada alleged that major pharmaceutical companies "unlawfully conspired to suppress the importation" of such drugs by engaging in group boycotts and other anticompetitive conduct. *Id.* at 787-88. The fatal flaw in those claims was that such importation was prohibited by FDA. The plaintiffs in that case argued that "they nonetheless may pursue an action under the federal antitrust laws based on the defendants' allegedly anti-competitive behavior." *Id.* at 791. The court rejected that argument because plaintiffs' "inability to import less expensive drugs distributed by Canadian pharmacies" did not constitute antitrust injury. *Id.* Rather, the alleged injury was "caused by the federal statutory and regulatory scheme adopted by the United States government, not by the conduct of the defendants." *Id.*; *see also Pennington*, 381 U.S. at 671 (holding that plaintiff "could not collect any damages under the Sherman Act for any injury which it suffered from the action of the Secretary of Labor*"); RSA Media, Inc. v. AK Media Grp.*, 260 F.3d 10, 15 (1st Cir. 2001); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 219-20. (2d Cir. 2005).

Here, as in *In re Canadian Import Antitrust Litigation*, "private parties may have influenced or persuaded the government to act, but the government's decision to act reflects an independent governmental choice, constituting a supervening 'cause' that breaks the link

between a private party's request and the plaintiffs injury." Areeda & Hovenkamp, *Antitrust Law*, ¶ 202[C], at 166.

Nucor further notes that enforcement of the antitrust injury requirement here does not deprive it of a remedy. First, the Commerce regulations provide that if a representation by an objector that it can timely supply domestic steel is shown to be inaccurate, the exclusion applicant is encouraged to refile and bring that information to Commerce's attention. After JSW allegedly was not able to procure domestic slabs in 2019, JSW utilized the remedy in 2021 by filing new exclusion requests and "explicitly detail[ing]" its 2019 experiences; those exclusion requests were all granted (*see* Sec. I(A)).

Second, Nucor points out that JSW already brought a lawsuit challenging the same denials of its 2019 exclusion requests, using the same arguments it does here. It brought that other lawsuit in the Court of International Trade, which JSW admitted has "exclusive jurisdiction" over challenges to "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." Doc. 45, Exh. D ¶ 9 (quoting 28 U.S.C. § 1581(i)(1)(B)). After over a year of litigation in the CIT, JSW settled that lawsuit with prejudice, securing some of the slab exclusions it sought, withdrawing others, obtaining refunds of some of the same tariff payments it now seeks as damages in this case, and waiving its right to further "challenge, or to make any claim with respect to or arising from the [2018] exclusion requests." Doc. 45, Exh. E ¶ 9 (emphasis added). Any further recovery by JSW would be duplicative, Nucor argues.

In its Response, JSW argues that it in fact suffered significant antitrust injury due to Defendants' conspiracy. The conspiracy, it argues, cut it off from domestic slab, which caused its

acquisition and overall manufacturing costs to increase dramatically and forced it to stop its

Baytown expansion project.

JSW argument is unavailing. First, Nucor's position is the more reasonable: the federal

government made tariffs on *imported* slab more expensive to promote domestic slab production

capacity. Because JSW imported much of its slab, its costs necessarily rose. Defendants, on the

other hand, produce slab domestically, so they were *intended* to benefit from the tariffs, as

reflected in their record-breaking profits. And in any event, again, JSW never alleges that Nucor

refused to sell it domestic slab, and it has not plausibly alleged facts from which the Court can

infer an illegal agreement between Nucor and the other Defendants regarding a refusal to deal.

None of Nucor's actions can be plausibly linked to Plaintiff's alleged antitrust injury.

Therefore, Plaintiff's failure to plausibly allege antitrust injury additionally and

independently requires dismissal of the Sherman Act claim.

### 4. *Whether JSW's state law claims do not state viable claims for relief*

Nucor, unlike the other Defendants, argues that the Court lacks personal jurisdiction over

Nucor with respect to JSW's state-law claims. The Court need not parse this question because,

even if the Court concluded it had jurisdiction, the state-law claims must fail for the following

reasons, which apply equally to all Defendants:

First, the *Noerr-Pennington* doctrine applies to JSW's state-law claims just the same as it

does to JSW's federal claim. That doctrine similarly bars the state-law claims as well.

"[A]lthough the *Noerr-Pennington* doctrine initially arose in the antitrust field," it is rooted in

the First Amendment and therefore courts have readily applied it to other types of claims, such as

"common-law tortious interference with contractual relations." *Video Int'l Prod., Inc. v. Warner–*

*Amex Cable Communications, Inc.*, 858 F.2d 1075, 1084 (5th Cir.1988), *cert. denied*, 491 U.S.

906 (1989); *see also Tricon*, 395 F. Supp 3d at 886 (Texas Antitrust Act); *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 128 (Tex. App. 1997) (civil conspiracy).

Second, "[b]ecause the Texas Free Enterprise and Antitrust Act utilizes the same standards as the Sherman Act for establishing a violation, the Sherman Act analysis applies to Plaintiffs' state law claims as well." *A&V*, 776 F.3d at 325 n.1; *see* Tex. Bus. & Com. Code Ann. § 15.04 (Texas Antitrust Act "shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes"); *Tricon*, 395 F. Supp. 3d at 882. Therefore, the same defects that require dismissal of JSW's Sherman Act claim—lack of plausible allegations of conspiracy, *Noerr-Pennington*, and lack of antitrust injury and causation—equally compel dismissal of the Texas antitrust claim.

Third, JSW's civil conspiracy and tortious interference counts must also be dismissed because these claims require an "independently tortious or unlawful" act by Nucor, which JSW has failed to plead. *See MMR Int'l Ltd. v. Waller Marine, Inc.*, 2013 WL 3864271, at *5 (S.D. Tex. July 24, 2013) ("A plaintiff must prove another substantive tort on which to base a civil conspiracy claim.") (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001) (tortious interference with business expectancy requires "conduct that was either independently tortious or unlawful"). Further, where, as here, a plaintiff has "tied [its] state law claims to the asserted antitrust violations," the "claims rise and fall together"; "as the antitrust claims are unsubstantiated, so must be the tortious interference claims." *Stewart Glass & Mirror, Inc. v. US Auto Glass Discount Ctrs.*, 200 F.3d 307, 316 (5th Cir. 2000).

Fourth, JSW's tortious interference claims must also be dismissed because JSW has not plausibly alleged that Defendants knew any specific information about JSW's contracts or

prospective business relations. *See Mark III Sys., Inc. v. Sysco Corp.*, 2007 WL 529960, at *5

(Tex. App. Feb. 22, 2007) (requiring "knowledge of the contract or relation" and "of the fact that

[defendant] is interfering with the performance of that contract"); *Frost Nat'l Bank v. Alamo*

*Nat'l Bank*, 421 S.W.2d 153, 156 (Tex. App. 1967) (actual knowledge required; mere notice

insufficient). JSW offers only conclusory statements that JSW's contracts "were a matter of

public knowledge" and that "Defendants" as a group were "aware" of those contracts. *Id.* ¶ 170.

For these reasons, the Court must dismiss the state-law claims, along with the Sherman Act

claim, against Nucor. Nucor's motions to dismiss is **GRANTED**.

### c.   U.S. Steel, AK Steel, and Cleveland-Cliffs, Inc.'s Joint Motion to Dismiss

The discussion above supporting dismissal as to the claims against Nucor generally apply

to the claims against the other Defendants as well. The Court incorporates the relevant

conclusions rather than redundantly restating them here.

The main difference between the factual context as to Nucor on one hand, and that as to

the other Defendants on the other, is that JSW allegedly dealt *directly* with U.S. Steel and AK

Steel (which has since been acquired by Cleveland-Cliffs) when it sent "firm inquiries" about

domestic slab. JSW makes much of Defendants' creditworthiness checks and technical

variations, alleging that they were pretextual and effectively amounted to a refusal to deal

"against their admitted self-interest" to profit from the sales. JSW argues that these actions

against the Defendants' own stated self-interests—along with the "common motive" to boycott

JSW to suppress a competitor, their dominance in the market, and opportunities to conspire at

trade association meetings—support an inference of conspiracy.

Plaintiff's conclusory allegations still fail. Defendants' actions can just as easily be

explained as the result of their "independent business judgment." *Southway Theatres*, 672 F.2d at

494. Since JSW inquired about purchasing 30,000 tons of steel, it is unsurprising that the sellers sought to ensure that JSW could pay for the purchase through creditworthiness checks.

Further, JSW's resort to the Defendants' *present* 84% combined domestic steelmaking capacity, Doc. 51 at 21-22, is misleading. In 2018 and 2019, when most of the events described in the Complaint allegedly occurred, ArcelorMittal was an independent competitor, as JSW admitted (Compl. ¶ 52); yet JSW now includes ArcelorMittal in its share calculation. (Doc. 51 at 21). JSW, which imports steel slab for domestic production, Compl. ¶ 3, also insufficiently explains why "domestic steelmaking capacity" constitutes the relevant market.

Finally, based on the facts alleged, it appears it was JSW that left the negotiating table. Had it not done so, it could have, for example, addressed Defendants' proposed variations from the initial request or pushed AK Steel to accept a documentary letter of credit in lieu of the required standby letter of credit.

Thus, despite the added factual detail about JSW's dealings with U.S. Steel and AK Steel, the Court still concludes that JSW failed to plausibly allege a conspiracy regarding AK Steel, U.S. Steel, and Cleveland-Cliffs. For this reason—in addition to those relating to the *Noerr-Penning* doctrine and lack of antitrust injury, *see* Secs. II(B)(b)(2), (3)—the Court **GRANTS** U.S. Steel, AK Steel, and Cleveland-Cliffs' Joint Motion to Dismiss.

*        *        *

Despite Plaintiff's lengthy Complaint and briefing, it has failed to sufficiently allege a Sherman Act claim because: (A) it does not plausibly allege a conspiracy among Defendants; (B) the *Noerr-Pennington* doctrine applies to the Defendants' alleged conduct related to the Section 232 tariffs; and (C) JSW has failed to plausible allege an antitrust injury.

The state-law claims also fail because: (A) they rise and fall along with the Sherman Act claim, (B) the *Noerr-Pennington* similarly applies to them, and (C) JSW has not sufficiently alleged that Defendants knew any specific information about JSW's contracts or prospective business relations.

Thus, the Court **GRANTS** both motions to dismiss in their entirety. JSW's claims are dismissed with prejudice.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on February 17, 2022.

Keith P. Ellison
United States District Judge